[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-16158

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 22, 2010
JOHN LEY
CLERK

D. C. Docket No. 07-00761-CV-J-25HTS

BERNICE BROWN,
PAUL CHRISTIE,
DOROTHY COPELAND,
JUANITA COSTON,
ALICE COTHERN,
ROBERT DENTON,
CATHERINE DILLINGHAM,
SHARON FERNANDEZ,
TONY HARRIS,
NADINE HEAD,
JOANNE HEFLIN-GILLIS,
PEGGY HICKOX,
ALONZO JOHNSON,
MARY JANE MOSCHINI,
HOLLY MURRAY,
LORRAINE OLSON,
MINNIE REGISTER,
JAMES L. SMITH, SR.,
FONATINE WALLACE,
ESTHER WERTH,
as Personal Representatives of the estates of
Levi Brown, Sharon Christie, Robert Copeland,
Troy R. Coston, James A. Cothern, Linda L. Denton,
Catherine Dillingham, Sharon Fernandez,
Linda Harris, Carson W. Head, Milton Heflin,
Benjamin F. Hickox, Willie P. Johnson,

Giuliano P. Moschini, Perry Murray, Floyd
G. Olson, Jimmy C. Register, Wanette Smith,
Robert E. Wallace and Howard Werth, respectively.

Plaintiffs-Appellants-
Cross-Appellees,

versus

R.J. REYNOLDS TOBACCO COMPANY,
individually and as successor by merger
to the Brown & Williamson Tobacco
Corporation and the American Tobacco Company,
PHILIP MORRIS USA INC.,
LORILLARD TOBACCO COMPANY,
LORILLARD, INC.,
foreign corporations,

Defendants-Appellees-
Cross-Appellants.

_____

Appeals from the United States District Court
for the Middle District of Florida
_____

(July 22, 2010)

Before CARNES, HULL and ANDERSON, Circuit Judges.

CARNES, Circuit Judge:

I.

Almost two decades ago, six individuals filed a lawsuit in Florida state court against the major domestic makers of cigarettes and two industry organizations seeking over $100 billion in both compensatory and punitive damages for injuries allegedly caused by smoking. Liggett Grp. Inc. v. Engle, 853 So. 2d 434, 440–41 (Fla. 3d DCA 2003) (Engle II). The plaintiffs asserted claims of "strict liability, negligence, breach of express warranty, breach of implied warranty, fraud, conspiracy to commit fraud, and intentional infliction of emotional distress." Id. at 441. After some wrangling between the parties and an interlocutory appeal to the Third District Court of Appeal, a class was certified composed of "[a]ll Florida citizens and residents," R.J. Reynolds Tobacco Co. v. Engle, 672 So. 2d 39, 42 (Fla. 3d DCA 1996) (Engle I), "and their survivors who have suffered, presently suffer or who have died from diseases and medical conditions caused by their addiction to cigarettes that contain nicotine." Engle v. Liggett Grp. Inc., 945 So. 2d 1246, 1256 (Fla. 2006) (Engle III). There were estimated to be at least 700,000 class members. Id. at 1258; Engle II, 853 So. 2d at 442.

To manage the class action, the trial court developed a trial plan that had three phases. See Engle III, 945 So. 2d at 1256. Phase I was a year-long trial that involved only "common issues relating . . . to the defendants' conduct and the

3

general health effects of smoking." Id. The jury was given a verdict form at the end of Phase I containing a series of questions. The verdict form asked the jury to answer "yes" or "no" to each question for specific time periods for each of the defendants.

The Engle class came close to running the table—the jury answered "yes" to almost every question put to them. The jury found: (1) that smoking cigarettes causes 20 of 23 listed diseases or medical conditions; (2) that cigarettes containing nicotine are addictive or dependence producing; (3) that the defendants placed cigarettes on the market that were defective and unreasonably dangerous; (4) that the defendants made a false statement of a material fact, either knowing the statement was false or misleading, or being without knowledge as to its truth or falsity, with the intention of misleading smokers; (4a) that the defendants concealed or omitted material information, not otherwise known or available, knowing the material was false and misleading, or failed to disclose a material fact concerning or proving the health effects and/or addictive nature of smoking cigarettes; (5) that the defendants entered into an agreement to misrepresent information relating to the health effects of cigarette smoking, or the addictive nature of smoking cigarettes, with the intention that smokers and members of the public rely to their detriment; (5a) that the defendants entered into an agreement to

4

conceal or omit information regarding the health effects of cigarette smoking, or the addictive nature of smoking cigarettes, with the intention that smokers and members of the public rely to their detriment; (6) that the defendants sold or supplied cigarettes that were defective in that they were not reasonably fit for the uses intended; (7) that the defendants sold or supplied cigarettes that, at the time of sale or supply, did not conform to representations of fact made by the defendants either orally or in writing; (8) that the defendants failed to exercise the degree of care that a reasonable cigarette manufacturer would exercise under like circumstances; (9) that the defendants engaged in extreme and outrageous conduct or with reckless disregard relating to cigarettes sold to Florida smokers with the intent to inflict severe emotional distress; and (10) that the defendants' conduct rose to a level that would permit a potential award or entitlement to punitive damages. See id. at 1257 n.4.[1]

In Phase I, however, the jury was not asked whether the class had proven any of its claims; it did not decide if the defendants were liable to anyone on any

---

[1] The exceptions were that the jury found that smoking did not cause asthmatic bronchitis, infertility, or bronchioloalveolar carcinoma. The jury also found that one of the defendants, Brooke Group, Ltd., did not: place defective and unreasonably dangerous cigarettes on the market until after July 1, 1974; make a false statement of material fact with the intention of misleading smokers until after May 5, 1982; conceal or omit material information until after May 5, 1982; sell or supply defective cigarettes until after July 1, 1974; sell or supply cigarettes in breach of an express warranty until after July 1, 1974; or fail to exercise the degree of care that a reasonable cigarette manufacturer would exercise under like circumstances until July 1, 1969.

5

cause of action. See Engle III, 945 So. 2d at 1246 ("In Phase I, the jury decided issues related to Tobacco's conduct but did not consider whether any class members relied on Tobacco's misrepresentations or were injured by Tobacco's conduct."); Engle II, 853 So. 2d at 450 ("In Phase [I], the jury answered certain general questions about the defendants' products and conduct. The questions related to some, but not all of the elements of each legal theory alleged. . . . The jury did not determine whether defendants were liable to anyone. Essential elements of liability, such as reliance and proximate cause, were [not] tried in Phase I.").

Later, in Phase II, the same jury did determine that the defendants' conduct was the legal cause of three individual class representatives' injuries. The three were awarded a total of $12.7 million in compensatory damages after their comparative fault was taken into account. Engle III, 945 So. 2d at 1257. The jury also awarded a lump sum of $145 billion in punitive damages to the entire Engle class. Id.

Before Phase III could be conducted, the defendants appealed the verdicts the jury had returned in Phases I and II. Engle II, 853 So. 2d at 441–42; see also Brown v. R.J. Reynolds Tobacco Co., 576 F. Supp. 2d 1328, 1332 (M.D. Fla. 2008). The appeal resulted in a Third District Court of Appeal decision that the

Engle class should be decertified. The court concluded that class action treatment was inappropriate because "the plaintiffs smokers' claims [we]re uniquely individualized and [could not] satisfy the 'predominance' and 'superiority' requirements imposed by Florida's class action rules." Engle II, 853 So. 2d at 444. The court also reversed the compensatory damages award in favor of the three individual class representatives, finding that none of them had valid claims against any of the defendants.[2] As for the punitive damages award, the court reversed it on a variety of grounds that are not relevant to the present case. See id. at 470.

The class appealed the Third District Court of Appeal's decision to the Florida Supreme Court. That court agreed that the punitive damages award to the class should be reversed, Engle III, 945 So. 2d 1254, and agreed with the reversal of the compensatory damages award to one of the three individual class representatives, id. at 1276. However, the court reinstated the compensatory damages award to the other two class representatives.[3] Id. For our purposes

___

[2] The court concluded that two of the class representatives were not proper members of the class because they were not diagnosed with a disease until after October 31, 1994, the date it determined was the cut-off for class membership. The third class representative's claims, the court concluded, were barred by the statute of limitations. See Engle II, 853 So. 2d at 455 n.23.

[3] The Florida Supreme Court concluded that "the critical event" for class membership was "not when an illness was actually diagnosed by a physician, but when the disease or condition first manifested itself." Engle III, 945 So. 2d at 1276. The court also determined that

though, the most important parts of the Engle III decision are those involving certification of the Engle class and the jury's findings in Phase I.

The Florida Supreme Court decided that the trial court had not abused its discretion in certifying the Engle class for Phases I and II but also decided that "continued class action treatment for Phase III of the trial plan [was] not feasible because individualized issues such as legal causation, comparative fault, and damages [would] predominate." Id. at 1267–68. As for the jury's findings in Phase I, the court threw out four of them but determined that the remainder could stand.[4] See Engle III, 945 So. 2d at 1255. (We will refer to the findings that were not thrown out by the Florida Supreme Court as the Phase I "approved" findings.) The court then set out where the case should go from there:

_____

the cut-off date for class membership was November 21, 1996, not October 31, 1994, meaning that a would-be class member's disease must have manifested itself before that date. Id. at 1275. Because the disease of both class representatives had manifested itself before then, the court concluded that they were proper members of the class and reinstated the part of the judgment awarding them compensatory damages. Id. at 1276.

[4] The Florida Supreme Court threw out the jury's findings in response to Question 4, which involved fraud and misrepresentation, and Question 9, which involved intentional infliction of emotional distress. Engle III, 945 So. 2d at 1255. The court explained that the jury's findings in response to those questions were "nonspecific" and were "inadequate to allow a subsequent jury to consider individual questions of reliance and legal cause." Id. The court also threw out the jury's finding in response to Question 5, which involved civil conspiracy-misrepresentation, reasoning that finding could not stand because it "relie[d] on the underlying tort of misrepresentation." See id. Finally, the court threw out as premature the jury's finding in response to Question 10 that the plaintiffs were entitled to punitive damages. See id. at 1269.

8

> The pragmatic solution is to now decertify the class, retaining the jury's Phase I findings other than those on the fraud and intentional infliction of emotion distress claims, which involved highly individualized determinations, and the findings on the entitlement to punitive damages questions, which was premature. Class members can choose to initiate individual damages actions and the Phase I common core findings we approved above will have <u>res judicata effect</u> in those trials.

<u>Id.</u> at 1269 (emphasis added). The Florida Supreme Court's instruction that the Phase I approved findings have "res judicata effect" is at the heart of this appeal, which resulted from a lawsuit filed in federal district court by some of the former <u>Engle</u> class members.

In their amended complaint, the plaintiffs sought to recover compensatory and punitive damages from the defendants under theories of strict liability, breach of express warranty, breach of implied warranty, civil conspiracy to fraudulently conceal, fraudulent concealment, negligence, and loss of consortium. The plaintiffs asserted the "res judicata effect" of the <u>Engle</u> Phase I approved findings and took the position that the only issues left in the case were "specific causation, apportionment of damages, comparative fault, compensatory damages, entitlement to punitive damages, and punitive damages." The defendants disagreed and countered by asking the district court for a pre-trial order outlining the preclusive effect that the Phase I approved findings would have in this case. They wanted an

order "specifying that Plaintiffs cannot rely on the Engle findings as establishing any of the elements of their claims." The district court did issue an order that "the findings [could] not be given preclusive effect in any proceeding to establish any element of an Engle Plaintiff's claim." Brown, 576 F. Supp. 2d at 1348. The order, however, "reserv[ed] judgment on whether the findings [could] have any other preclusive effect." Id. The district court explained:

> [T]he Phase I findings may prevent a defendant from arguing, inter alia, that it never acted negligently, never engaged in a conspiracy to conceal, or never placed a defective product on the market. In addition, the general findings of Question 1, that cigarette smoking causes various diseases and illnesses and, in a proper circumstance, may be given preclusive effect, prevents the Defendants from denying that cigarette smoking itself has been found to cause, inter alia, aortic aneurysm, bladder cancer, coronary heart disease, and lung cancer.

Id. at 1344 n.25. This is the plaintiffs' interlocutory appeal of that pretrial order. See 28 U.S.C. § 1292(b).

## II.

The district court determined that allowing the Engle Phase I approved findings to establish elements of the plaintiffs' causes of action would violate the defendants' due process rights. See Brown, 576 F. Supp. 2d at 1344–46. The plaintiffs contend that under the Rooker-Feldman doctrine the district court lacked jurisdiction to determine whether applying the Florida Supreme Court's decision

10

about the preclusive effect of the Engle Phase I approved findings would be unconstitutional.  See Rooker v. Fid. Trust Co., 261 U.S. 114, 43 S.Ct. 288 (1923); Dist. of Columbia Court of Appeals v. Feldman, 460 U.S. 462, 103 S.Ct. 1303 (1983).  We disagree.

The Rooker-Feldman doctrine is jurisdictional.  It "prevents . . . lower federal courts from exercising jurisdiction over cases brought by 'state-court losers' challenging 'state-court judgments rendered before the district court proceedings commenced.'"  Lance v. Dennis, 546 U.S. 459, 460, 126 S.Ct. 1198, 1199 (2006) (quoting Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 284, 125 S.Ct. 1517, 1521–22 (2005)).  The doctrine bars the losing party in state court "from seeking what in substance would be appellate review of the state judgment in a United States district court, based on the losing party's claim that the state judgment itself violates the loser's federal rights."  Johnson v. De Grandy, 512 U.S. 997, 1005–06, 114 S.Ct. 2647, 2654 (1994).

Recently, in Exxon Mobil Corp. v. Saudi Basic Industries Corp., 544 U.S. 280, 125 S.Ct. 1517 (2005), the Supreme Court clarified the doctrine and narrowed its application, noting that "the doctrine has sometimes been construed [by lower federal courts] to extend far beyond the contours of the Rooker and Feldman cases."  Id. at 283, 125 S.Ct. at 1521.  The Court held that it should be

"confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." Id. at 284, 125 S.Ct. at 1521–22; see Casale v. Tillman, 558 F.3d 1258, 1261 (11th Cir. 2009) (per curiam) ("[T]he Supreme Court's recent Rooker-Feldman decisions have noted the 'narrowness' of the rule . . . ." (citing Lance, 546 U.S. at 464, 126 S.Ct. at 1201)); Hoblock v. Albany County Bd. of Elections, 422 F.3d 77, 85 (2d Cir. 2005) ("In Exxon Mobil, the Supreme Court pared back the Rooker-Feldman doctrine to its core . . . .").

Although the defendants before us were the "state-court losers" in Engle Phase I, where the approved findings were entered, they did not bring this lawsuit. It was brought by the plaintiffs who were the state-court winners. The Rooker-Feldman doctrine only applies when the federal plaintiff is the "state-court loser."[5] See Exxon Mobil, 544 U.S. at 284, 125 S.Ct. at 1521–22. The plaintiffs argue that the state-court-loser-as-plaintiff procedural model is simply the usual fact pattern, not a requirement for application of the doctrine. They point out that 28 U.S.C. §

---

[5] The district court's order applies to 3,200 cases removed from state court and another 661 cases originally filed in federal court. Even in the removed cases, the federal plaintiff is still the "state-court winner," not the "state-court loser."

1257(a), the principal statute upon which the doctrine is based, makes no distinction between plaintiffs and defendants.[6] It does not, but the Supreme Court did.

In Exxon Mobil the Court could scarcely have been clearer in stating that the Rooker-Feldman doctrine is "confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." Id. (emphasis added). We will not ignore the Supreme Court's instruction and apply the doctrine to a case like this one where the federal plaintiff

---

[6] That statute provides:

Final judgments or decrees rendered by the highest court of a State in which a decision could be had, may be reviewed by the Supreme Court by writ of certiorari where the validity of a treaty or statute of the United States is drawn in question or where the validity of a statute of any State is drawn in question on the ground of its being repugnant to the Constitution, treaties, or laws of the United States, or where any title, right, privilege, or immunity is specially set up or claimed under the Constitution or the treaties or statutes of, or any commission held or authority exercised under, the United States.

28 U.S.C. § 1257(a). The Rooker-Feldman doctrine "draws a negative inference from section 1257: because Congress only provided for review of state court judgments by the Supreme Court, Congress therefore intended to preclude lower federal courts from exercising such review." Nicholson v. Shafe, 558 F.3d 1266, 1272 (11th Cir. 2009) (quotation marks omitted). The doctrine is also shaped by 28 U.S.C. § 1331, which provides federal district courts with "original jurisdiction," rather than appellate jurisdiction, "of all civil actions arising" under federal law. See 28 U.S.C. § 1331; Nicholson, 558 F.3d at 1271–72; Green v. Jefferson Cnty. Comm'n, 563 F.3d 1243, 1249 (11th Cir. 2009).

13

is not the "state-court loser" and is not seeking "review and rejection" of a state court judgment. The Rooker-Feldman doctrine is inapplicable here. In place of it, ordinary preclusion rules govern the effect of the Engle Phase I approved findings. See id. at 284, 125 S.Ct. at 1522 ("Rooker-Feldman does not otherwise override or supplant preclusion doctrine . . . .").

III.

Under the Full Faith and Credit Act, 28 U.S.C. § 1738, a federal court must "give preclusive effect to a state court judgment to the same extent as would courts of the state in which the judgment was entered." Kahn v. Smith Barney Shearson Inc., 115 F.3d 930, 933 (11th Cir. 1997); see also Marrese v. Am. Acad. of Orthopaedic Surgeons, 470 U.S. 373, 380, 105 S.Ct. 1327, 1332 (1985) (stating that § 1738 "directs a federal court to refer to the preclusion law of the State in which judgment was rendered"). That means the Phase I approved findings must be given the same preclusive effect in this federal court case that they would be given if the case were in state court. Florida preclusion law controls.

In Engle III, as we have already noted, the Florida Supreme Court directed that the Phase I approved findings were to have "res judicata effect" in future trials involving former class members. See Engle III, 945 So. 2d at 1269 ("Class members can choose to initiate individual damages actions and the Phase I

14

common core findings we approved above will have res judicata effect in those trials." (emphasis added)); id. at 1254 ("[W]e remand with directions that the class should be decertified without prejudice to the class members filing individual claims . . . with res judicata effect given to certain Phase I findings." (emphasis added)); id. at 1277 ("Individual plaintiffs within the class will be permitted to proceed individually with the [approved] findings . . . given res judicata effect in any subsequent trial between individual class members and the defendants." (emphasis added)).

The term "res judicata" is translated from the Latin as "a thing adjudicated," but it has more than one meaning. See Black's Law Dictionary 1336 (8th ed. 2004). It can refer specifically to claim preclusion or it can refer generally to the preclusive effect of earlier litigation. See Wacaster v. Wacaster, 220 So. 2d 914, 915 (Fla. 4th DCA 1969) ("Res judicata is a term which has been given a good many different meanings. Current usage apparently gives it a broad meaning which covers all the various ways in which a judgment in one action will have a binding effect in another."). When the term has that second meaning, it encompasses claim preclusion and issue preclusion, and it can mean either or both. See Taylor v. Sturgell, 553 U.S. 880, __, 128 S.Ct. 2161, 2171 (2008) ("The preclusive effect of a judgment is defined by claim preclusion and issue

15

preclusion, which are collectively referred to as 'res judicata.'"); David Vincent, Inc. v. Broward County, 200 F.3d 1325, 1330 n.7 (11th Cir. 2000) ("Claim and issue preclusion are often lumped together under the rubric of res judicata."); Aquatherm Indus., Inc. v. Fla. Power & Light Co., 84 F.3d 1388, 1391 n.1 (11th Cir. 1996) ("[T]he terminology used to discuss the preclusive effects of earlier litigation is somewhat confusing because res judicata is often used to refer both to claim preclusion and to issue preclusion."). Issue preclusion is also sometimes called collateral estoppel. Thus, the Florida Supreme Court's direction that the Phase I approved findings were to have "res judicata effect" could have referred to claim preclusion, to issue preclusion, or to both.

Claim preclusion "bars a subsequent action between the same parties on the same cause of action." State v. McBride, 848 So. 2d 287, 290 (Fla. 2003); see also Pumo v. Pumo, 405 So. 2d 224, 226 (Fla. 3d DCA 1981) ("Under the doctrine of res judicata, a final judgment or decree on the merits by a court of competent jurisdiction constitutes an absolute bar to a subsequent suit on the same cause of action and is conclusive of all issues which were raised or could have been raised in the action."); Seaboard Coast Line R.R. Co. v. Indus. Contracting Co., 260 So. 2d 860, 862 (Fla. 4th DCA 1972) (same). The doctrine applies under Florida law "when all four of the following conditions are present: (1) identity of the thing

16

sued for; (2) identity of the cause of action; (3) identity of persons and parties to the action; and (4) identity of quality in persons for or against whom claim is made." Fla. Bar v. Rodriguez, 959 So. 2d 150, 158 (Fla. 2007) (quotation marks omitted).

Issue preclusion, by contrast, operates more narrowly to prevent re-litigation of issues that have already been decided between the parties in an earlier lawsuit. See Mortg. Elec. Registration Sys., Inc. v. Badra, 991 So. 2d 1037, 1039 (Fla. 4th DCA 2008) (stating that issue preclusion "precludes re-litigating an issue where the same issue has been fully litigated by the same parties or their privies, and a final decision has been rendered by a court"); State Dep't of Revenue v. Ferguson, 673 So. 2d 920, 922 (Fla. 2d DCA 1996) ("The doctrine of collateral estoppel prevents identical parties from relitigating issues that have previously been decided between them."); Rohan v. Trakker Maps, Inc., 633 So. 2d 1176, 1177 (Fla. 3d DCA 1994) ("The application of collateral estoppel prevents the parties in a second suit from litigating those points in question which were actually adjudicated in the first suit."); Liberty Mut. Ins. Co. v. Jozwick, 204 So. 2d 216, 218 (Fla. 3d DCA 1967) ("Estoppel by judgment [or issue preclusion] prevents parties from litigating in a second suit common issues which were actually adjudicated in a prior action.").

The "essential elements" of issue preclusion under Florida law are "that the parties and issues be identical, and that the particular matter be fully litigated and determined in a contest which results in a final decision of a court of competent jurisdiction." Dadeland Depot, Inc. v. St. Paul Fire & Marine Ins. Co., 945 So. 2d 1216, 1235 (Fla. 2006) (quotation marks omitted); see also Dep't of Health & Rehabilitative Servs. v. B.J.M., 656 So. 2d 906, 910 (Fla. 1995) (same); Mobil Oil Corp. v. Shevin, 354 So. 2d 372, 374 (Fla. 1977) (same); Holt v. Brown's Repair Serv., Inc., 780 So. 2d 180, 182 (Fla. 2d DCA 2001) ("[F]or the doctrine of collateral estoppel to apply, an identical issue must be presented in a prior proceeding; the issue must have been a critical and necessary part of the prior determination; there must have been a full and fair opportunity to litigate that issue; the parties in the two proceedings must be identical; and the issues must have been actually litigated.").

When those elements are present, issue preclusion can be applied offensively or defensively. See E.C. v. Katz, 731 So. 2d 1268, 1269 (Fla. 1999) (recognizing that Florida law requires mutuality of parties for both defensive and offensive use of issue preclusion); Massey v. David, 831 So. 2d 226, 233 (Fla. 1st DCA 2002) (same); Zeidwig v. Ward, 548 So. 2d 209, 212 (Fla. 1989) (offensive use occurs when a plaintiff seeks to prevent a defendant from re-litigating an

18

identical issue previously decided against that defendant); see Katz, 731 So. 2d at 1269–70 (defensive use occurs when a defendant seeks to prevent a plaintiff from re-litigating an identical issue previously decided against that plaintiff).

In Phase I the same parties as in the present lawsuit litigated "common issues" relating to "the defendants' conduct and the general health effects of smoking." Engle III, 945 So. 2d at 1256; see also id. at 1263 (noting that the Phase I jury "did not determine whether the defendants were liable to anyone" (quotation marks omitted)); id. at 1267–68 (explaining that the Engle class must be prospectively decertified because "individualized issues such as legal causation, comparative fault, and damages [would] predominate"). "The idea underlying [claim preclusion] is that if a matter has already been decided, the [litigant] has already had his or her day in court, and for purposes of judicial economy, that matter generally will not be reexamined . . . ." Topps v. State, 865 So. 2d 1253, 1254–55 (Fla. 2004); see also Denson v. State, 775 So. 2d 288, 290 n.3 (Fla. 2000) (per curiam) (same). The defendants had their day in court on the "common issues" of fact that were decided in Phase I, and later approved by the Florida Supreme Court, but they did not have their day in court on the broader questions involving the causes of action the class asserted, which were left undecided. See Engle III, 945 So. 2d at 1263.

19

Because factual issues and not causes of action were decided in Phase I, the Florida Supreme Court's direction that the approved findings were to have "res judicata effect" in future trials involving former class members necessarily refers to issue preclusion. See Rice-Lamar v. Fort Lauderdale, 853 So. 2d 1125, 1131 (Fla. 4th DCA 2003) (stating that issue preclusion "does not require prior litigation of an entire claim, only a particular issue"); Club & Cmty. Consulting Corp. v. Brown, 728 So. 2d 822, 824 (Fla. 4th DCA 1999) ("The application of collateral estoppel does not require that the entire claim have been previously litigated, only that an issue have been litigated."). The parties agree that issue preclusion, not claim preclusion, is what the Florida Supreme Court meant.[7] They also agree that the defendants cannot re-litigate the Phase I approved findings. The parties disagree, however, about what the findings mean to this case. The plaintiffs think that they mean a lot while the defendants think that they mean not so much.

As we have already explained, issue preclusion only operates to prevent the re-litigation of issues that were decided, or "actually adjudicated," between the

_____

[7] The plaintiffs argued before the district court and suggested in their brief to this Court that the Florida Supreme Court was referring to claim preclusion in Engle III. However, at oral argument the plaintiffs clarified that their position is that the Phase I approved findings are entitled to issue preclusive effect. As our discussion in the text makes clear, if the plaintiffs had continued to argue for claim preclusion, we would have rejected that position.

20

parties in an earlier lawsuit.  See Gordon v. Gordon, 59 So. 2d 40, 44 (Fla. 1952) (stating that issue preclusion prevents "parties from litigating in the second suit issues—that is to say points and questions—common to both causes of action and which were actually adjudicated in the prior litigation"); Hittel v. Rosenhagen, 492 So. 2d 1086, 1089–90 (Fla. 4th DCA 1986) ("It is essential that the question [being given issue preclusive effect] was actually adjudicated and that, if there is any doubt as to whether a litigant has had his day in court such doubt must be resolved in favor of the full consideration of the substantive issues of the litigation . . . ."); Chandler v. Chandler, 226 So. 2d 697, 699 (Fla. 4th DCA 1969) (noting that "[i]n collateral estoppel the 'precise fact' or 'every point and question' on the issue must have been decided").

Florida courts have enforced the "actually adjudicated" requirement, see Gordon, 59 So. 2d at 44, with rigor.  Issue preclusive effect is not given to issues which could have, but may not have, been decided in an earlier lawsuit between the parties.  See, e.g., Acadia Partners, L.P. v. Tompkins, 673 So. 2d 487, 488–89 (Fla. 5th DCA 1996) (holding that jury's verdict "for [the defendant]" in a breach of contract action did not establish the absence of breach because the jury was instructed that it could find for the defendant if it concluded that the defendant had not breached the contract or if the defendant proved an affirmative defense);

21

Allstate Ins. Co. v. A.D.H., Inc., 397 So. 2d 928, 929–30 (Fla. 3d DCA 1981) (concluding that subcontractor could not show that general contractor was at fault and therefore not entitled to indemnification based on jury's "undifferentiated general verdict finding [the general contractor] 'negligent'" in an earlier lawsuit; the jury could have determined that the general contractor was at fault or vicariously liable); Seaboard, 260 So. 2d at 864–65 (finding that general verdict "in favor of the defendant" could have been based on jury's conclusion that the defendant was not negligent or that the plaintiff was contributorily negligent); see id. at 865 ("[I]t is impossible to ascertain with any reasonable degree of certainty as to what issue was adjudicated in the former suit except to say that the jury found in favor of [the defendant]. Such uncertainty as to the effect of the prior adjudication renders the doctrine of collateral estoppel inapplicable.").

Applying the "actually adjudicated" requirement to this case, the Phase I approved findings may not be used to establish facts that were not actually decided by the jury. The plaintiffs, who want the benefit of the findings in this case, do not disagree with that proposition. And, of course, neither do the defendants. In fact, the defendants contend that using the findings to establish facts that were not decided by the jury would violate their due process rights. We need not decide that constitutional issue, because under Florida law the findings could not be used

for that purpose anyway. The bottom line, then, is that the Phase I approved findings may be given effect to the full extent of, but no farther than, what the jury found. The disagreement is about what the jury actually did find. The defendants, taking a narrow view, insist that the only facts found by the jury are those framed by the specific factual issue set out in the questions posed to them on the verdict form. The plaintiffs, by contrast, take a broader view of what facts the jury decided, arguing that the language of the questions, and hence the jury's answers, can and should be fleshed out using the record as a whole and apparently by going outside the record.

For example, Question 3 on the verdict form asked the jury: "Did one or more of the Defendant Tobacco Companies place cigarettes on the market that were defective and unreasonably dangerous?" The jury answered "yes," for every time period for every defendant except Brooke Group, Ltd., Inc.[8] Under the defendants' view, the only fact that the jury found was that they sold some cigarette that was defective and unreasonably dangerous during the time periods listed on the verdict form. That would mean that the finding may not establish anything more specific; it may not establish, for instance, that any particular type

---

[8] The jury found that Brooke Group, Ltd., Inc., sold cigarettes that were defective and unreasonably dangerous after July 1, 1974, but not before that date.

23

of cigarette sold by a defendant during the relevant time period was defective and unreasonably dangerous. Under the plaintiffs' broader view the jury's finding must mean that all cigarettes the defendants sold were defective and unreasonably dangerous because there is nothing to suggest that any type or brand of cigarette is any safer or less dangerous than any other type or brand. One problem with that argument is that the plaintiffs have pointed to nothing in the record, and there is certainly nothing in the jury findings themselves, to support their factual assertion.[9] Under Florida law the issue preclusion standard requires the asserting party to show with a "reasonable degree of certainty" that the specific factual issue was determined in its favor. See Seaboard, 260 So. 2d at 864–65. The entire trial record may be considered for that purpose, although the burden is on the asserting party to point to specific parts of it to support its position, so long as those parts of the record combine to show to a reasonable degree of certainty that the jury made the specific factual determination that is being asserted. Nothing in the decisions we have read suggests that the inquiry may extend to matters outside the trial

---

[9] In their brief the plaintiffs point to the website of Philip Morris as evidence that all cigarette types and brands are equally dangerous, but the brief does not suggest that the website was part of the trial record. Even if it was, there still would be no indication that the jury actually found as a fact that all types and brands of cigarettes were equally defective and unreasonably dangerous.

24

record, and it would not make sense to do so since the jury could not have appropriately considered anything outside the record.[10]

In the pre-trial order that is the subject of this interlocutory appeal, the district court decided that the Phase I approved findings may not be used to establish any element of the plaintiffs' causes of action. Brown, 576 F. Supp. 2d at 1348. The district court reached that conclusion without first giving preclusive effect to the Phase I approved findings. See id. The Phase I approved findings have to be given preclusive effect; they do establish some facts that are relevant to this litigation. Otherwise, the Florida Supreme Court's statement in Engle III that the Phase I approved findings were to have "res judicata effect" in trials involving former class members would be meaningless. See Engle III, 945 So. 2d at 1254, 1269, 1277.

We leave it to the district court to apply Florida law as we have outlined it and decide in the first instance precisely what facts are established when preclusive effect is given to the approved findings. It is for the district court to

---

[10] Although not deftly presented, there is in the plaintiffs' main brief something from which one might infer an argument that the jury's findings can be combined with facts that can be proven through other means to establish an element of a claim. For example, a Phase I approved finding that the defendants sold cigarettes that were defective and unreasonably dangerous might be combined with proof in this lawsuit that all cigarettes are equally defective and unreasonably dangerous. Maybe, but the argument is too poorly developed now for us to address. We leave it to the district court to decide the matter if it is appropriately presented.

determine, for example, whether the jury's answer to Question 3 establishes only that the defendants sold some cigarettes that were defective and unreasonably dangerous, or whether the plaintiffs have carried their burden of showing to a reasonable degree of certainty that it also establishes that all of the cigarettes that the defendants sold fit that description. See Seaboard, 260 So. 2d at 864–65.

Until the scope of the factual issues decided in the Phase I approved findings is determined, it is premature to address whether those findings by themselves establish any elements of the claims. Only after Florida law is properly applied to determine the scope of the facts established by the approved findings can it be decided which, if any, elements of the claims are established by them. Accordingly, the district court's ruling that "the findings may not be given preclusive effect in any proceeding to establish any element of an Engle Plaintiff's claim," cannot stand, at least not at this time. That finishes our consideration of the case. See McFarlin v. Conseco Servs., LLC, 381 F.3d 1251, 1255–56 (11th Cir. 2004) ("[T]he scope of appellate review is not limited to the precise question certified by the district court because the district court's order, not the certified question, is brought before the court. . . . [W]e have the power to review an entire order, either to consider a question different from the one certified as controlling

26

or to decide the case despite the lack of any identified controlling question."

(quotation marks and citations omitted)).[11]

## IV.

The district court's order that was certified for interlocutory appeal is VACATED, and the case is REMANDED for further proceedings consistent with this opinion.

---

[11]Our colleague, Judge Anderson, has filed a concurring opinion. We fully agree with everything that he says in that opinion and incorporate its statements into this one.

ANDERSON, Circuit Judge, concurring specially:

I concur in Judge Carnes' opinion for the court. Although plaintiffs failed to persuade the district court at this stage of the litigation that they could show with the requisite degree of certainty that all facts necessary to establish any particular element of any plaintiff's cause of action had been actually adjudicated and actually decided by the Phase I jury,[1] I agree that it would be premature at this stage of the litigation to rule flatly that the Phase I findings cannot be given preclusive effect in these proceedings to contribute to or establish any element of any plaintiff's claim. I agree that it would be premature at this stage of the litigation to conclude that later in this litigation plaintiffs will be unable to use some Phase I findings to contribute to or establish some particular element of a plaintiff's cause of action, perhaps in conjunction with other facts proved in this litigation. For example, <u>see</u> footnote 10 of Judge Carnes' opinion for the court.

---

[1]   Nor have plaintiff's arguments on appeal been persuasive in this regard. The generality of the Phase I findings present plaintiffs with a considerable task. The Florida issue preclusion law will have to be applied to specific facts demonstrated with the requisite certainty to have been adjudicated and decided by the Phase I jury (which plaintiffs thus far have not attempted to do). In order to use Phase I findings to help establish any particular element of any plaintiff's cause of action, plaintiffs not only will have to do the foregoing, but it will also probably be necessary for plaintiffs to prove additional facts in this litigation.

28