[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-13500
_____

D.C. Docket No. 3:09-cv-10598-RBD-JBT

ALVIN WALKER,
as Personal Representative of the Estate of Albert Walker,

Plaintiffs–Appellees,

versus

R.J. REYNOLDS TOBACCO COMPANY,
individually and as successor by merger to the Brown &
Williamson Tobacco Corporation and the American
Tobacco Company, a foreign corporation,

Defendant –Appellant.

_____

No. 12-14731
_____

D.C. Docket No. 3:09-cv-10104-RBD-JBT

GEORGE DUKE, III,
as Personal Representative of the Estate of Sarah Duke,

Plaintiff–Appellee,

versus

R.J. REYNOLDS TOBACCO COMPANY,
individually and as successor by merger to the Brown &
Williamson Corporation and the American
Tobacco Company, a foreign corporation,

                                                    Defendant–Appellant.

_____

Appeals from the United States District Court
for the Middle District of Florida
_____

(October 31, 2013)

Before PRYOR and HILL, Circuit Judges, and HALL,* District Judge.

PRYOR, Circuit Judge:

We sua sponte vacate and reconsider our original opinion in this matter. We substitute the following opinion for our original opinion.

This appeal by R.J. Reynolds Tobacco Company of money judgments in favor of the survivors of two smokers requires us to decide whether a decision of the Supreme Court of Florida in an earlier class action is entitled to full faith and credit in federal court. Florida smokers and their survivors filed in state court a class action against the major tobacco companies that manufacture cigarettes in the United States. In the first phase of the class action, a jury decided that the tobacco companies breached a duty of care, manufactured defective cigarettes, and

_____

*Honorable James R. Hall, United States District Judge for the Southern District of Georgia, sitting by designation.

2

concealed material information, but the jury did not decide whether the tobacco companies were liable for damages to individual members of the class. The Supreme Court of Florida approved the jury verdict, but decertified the class going forward. Engle v. Liggett Grp., Inc., 945 So. 2d 1246, 1254 (Fla. 2006). Members of the class then filed individual complaints in federal and state courts. The Supreme Court of Florida later ruled that the findings of the jury in the class action have res judicata effect for common issues decided against the tobacco companies and in favor of the smokers and that the only unresolved issues in the individual lawsuits filed afterward involve specific causation and damages. Philip Morris USA, Inc. v. Douglas, 110 So. 3d 419, 432 (Fla. 2013). R.J. Reynolds argues that the application of res judicata in later suits filed by individual smokers violates its constitutional right to due process of law because the jury verdict in the class action is so ambiguous that it is impossible to tell whether the jury found that each tobacco company acted wrongfully with respect to any specific brand of cigarette or any individual plaintiff. After the district court ruled that giving res judicata effect to the findings of the jury in the class action does not violate the rights of the tobacco companies to due process, two juries awarded money damages to the survivors of two smokers in their suits against R.J. Reynolds. Because R.J. Reynolds had a full and fair opportunity to be heard in the Florida class action and the application of res judicata under Florida law does not cause an arbitrary

3

deprivation of property, we affirm the judgments against R.J. Reynolds and in favor of the survivors of the smokers.

## I.    BACKGROUND

In 1994, six individuals filed a putative class action in a Florida court against the major domestic manufacturers of cigarettes, including R.J. Reynolds, and two tobacco industry organizations. Brown v. R.J. Reynolds Tobacco Co., 611 F.3d 1324, 1326 (11th Cir. 2010). The plaintiffs sought more than $100 billion in damages for injuries allegedly caused by smoking cigarettes. Id. Their complaint asserted claims of strict liability, negligence, breach of express warranty, breach of implied warranty, fraud, conspiracy to commit fraud, and intentional infliction of emotional distress. Id. A Florida court of appeals approved the certification of a plaintiff class of all Florida citizens and residents who have suffered or died from medical conditions caused by their addiction to cigarettes and the survivors of those citizens and residents. R.J. Reynolds Tobacco Co. v. Engle, 672 So. 2d 39, 40, 42 (Fla. 3d Dist. Ct. App. 1996).

The trial court divided the class action in three phases. Phase I of the class action "consisted of a year-long trial to consider the issues of liability and entitlement to punitive damages for the class as a whole." Engle, 945 So. 2d at 1256. During that phase, the jury considered only "common issues relating exclusively to the defendants' conduct and the general health effects of smoking,"

4

id. at 1256, but the jury did not decide whether the tobacco companies were liable to any of the class representatives or members of the class, id. at 1263. In Phase II of the trial, the same jury determined the liability of the tobacco companies to three individual class representatives, awarded compensatory damages to those individuals, and fixed the amount of class-wide punitive damages. Id. at 1257. According to the trial plan, in Phase III of the class action, new juries were to decide the claims of the rest of the class members. Id. at 1258.

In Phase I of the trial, the plaintiffs presented evidence about some defects that were specific to certain brands or types of cigarettes and other defects common to all cigarettes. For example, "proof submitted on strict liability included brand-specific defects, but it also included proof that the Engle defendants' cigarettes were defective because they are addictive and cause disease." Douglas, 110 So. 3d at 423. "Similarly, arguments concerning the class's negligence, warranty, fraud, and conspiracy claims included whether the Engle defendants failed to address the health effects and addictive nature of cigarettes, manipulated nicotine levels to make cigarettes more addictive, and concealed information about the dangers of smoking." Id. The trial plan called for the jury "to decide issues common to the entire class, including general causation, [and] the Engle defendants' common liability to the class members for the conduct alleged in the complaint." Id. at 422.

5

At the conclusion of Phase I, the trial court submitted to the jury a verdict form with a series of questions to be answered "yes" or "no."  The trial court instructed the jury that "all common liability issues would be tried before [the] jury" and that Phase I of the trial "did not address issues as to the conduct or damages of individual members of the Florida class."  The first question on the verdict form asked the jury whether "smoking cigarettes cause[s]" a list of enumerated diseases, and the jury found that smoking causes 20 specific diseases, including various forms of cancer.  The second question asked the jury whether "cigarettes that contain nicotine [are] addictive and dependence producing," and the jury found that cigarettes are addictive and dependence producing.

The jury then answered "yes" to each of the following questions for each tobacco company:

- Did the tobacco company "place cigarettes on the market that were defective and unreasonably dangerous";

- Did the tobacco company "make a false statement of a material fact, either knowing the statement was false or misleading, or being without knowledge as to its truth or falsity, with the intention of misleading smokers";

- Did the tobacco company "conceal or omit material information, not otherwise known or available, knowing that the material was false and misleading, or fail[ ] to disclose a material fact concerning or proving the health effects and/or addictive nature of smoking cigarettes";

- Did the tobacco company "enter into an agreement to misrepresent information relating to the health effects of cigarette smoking, or the

6

addictive nature of smoking cigarettes, with the intention that smokers and members of the public rely to their detriment";

- Did the tobacco company "enter into an agreement to conceal or omit information regarding the health effects of cigarette smoking, or the addictive nature of smoking cigarettes, with the intention that smokers and members of the public rely to their detriment";

- Did the tobacco company "sell or supply cigarettes that were defective in that they were not reasonably fit for the uses intended";

- Did the tobacco company "sell or supply cigarettes that, at the time of sale or supply, did not conform to representations of fact made by [the tobacco company], either orally or in writing";

- Did the tobacco company "fail[ ] to exercise the degree of care which a reasonable cigarette manufacturer would exercise under like circumstances";

- Did the tobacco company "engage[] in extreme and outrageous conduct or with reckless disregard relating to cigarettes sold or supplied to Florida smokers with the intent to inflict severe emotional distress."

The final question asked the jury whether "the conduct of [each tobacco company] rose to a level that would permit a potential award or entitlement to punitive damages," and the jury answered "yes" for each tobacco company.

The tobacco companies unsuccessfully objected to the verdict form that the trial court submitted to the jury in Phase I. They argued that the verdict form did not "ask for specifics" about the tortious conduct of the tobacco companies, "render[ing] [the jury findings] useless for application to individual plaintiffs." They requested that the trial court submit to the jury a more detailed verdict form

7

that would have asked the jury to identify the brands of cigarettes that were defective and the information the companies concealed from the public. The trial court rejected that proposed verdict form as too detailed and impractical.

In Phase II of the trial, the same jury determined that the defendants were liable to three named plaintiffs. The jury awarded compensatory damages of $12.7 million to those three named plaintiffs, and the jury awarded punitive damages of $145 billion to the class. Brown, 611 F.3d at 1328.

Before Phase III of the trial began, the tobacco companies filed an interlocutory appeal of the verdicts in Phases I and II, and the Supreme Court of Florida approved in part and vacated in part the verdicts. Engle, 945 So. 2d at 1246. The court concluded that the trial court did not abuse its discretion when it certified the Engle class for purposes of Phases I and II of the trial, but that the class must be decertified going forward so that members of the class could pursue their claims to finality in individual lawsuits. Id. at 1267–69. The court explained that "problems with the three-phase trial plan negate the continued viability of this class action" and that "continued class action treatment for Phase III of the trial plan is not feasible because individualized issues such as legal causation, comparative fault, and damages predominate." Id. at 1267–68. The court held as follows that most findings of the jury in Phase I should have "res judicata effect" in the ensuing individual trials:

8

> The pragmatic solution is to now decertify the class, retaining the jury's Phase I findings other than those on the fraud and intentional infliction of emotion[al] distress claims, which involved highly individualized determinations, and the finding on entitlement to punitive damages questions, which was premature. <u>Class members can choose to initiate individual damages actions and the Phase I common core findings we approved above will have res judicata effect in those trials.</u>

<u>Id.</u> at 1269 (emphasis added). The court concluded that the findings about fraud and misrepresentation and intentional infliction of emotional distress cannot have preclusive effect because "the non-specific findings in favor of the plaintiffs" on those questions were "inadequate to allow a subsequent jury to consider individual questions of reliance and legal cause." <u>Id.</u> at 1255. The court also vacated the finding about civil conspiracy-misrepresentation because it relied on the underlying tort of misrepresentation. But the court stated that the other findings, now known as the approved findings from Phase I, have res judicata effect. <u>Id.</u> The court also vacated the award of punitive damages on the ground that it was excessive and premature, affirmed the damages award in favor of two of the named plaintiffs, and vacated the judgment in favor of the third named plaintiff because the statute of limitations barred his claims. <u>Engle</u>, 945 So. 2d at 1254–56.

After the decision of the Supreme Court of Florida, members of the <u>Engle</u> class filed thousands of individual cases in both state and federal courts. A central issue in these cases is whether plaintiffs may rely on the approved findings from Phase I to establish the "conduct" elements of their claims against the tobacco

9

companies.  The dispute concerns the meaning of the ruling in Engle that the approved findings from Phase I "will have res judicata effect."  The plaintiffs interpreted the ruling to mean that the tobacco companies could dispute only specific causation and damages in the individual lawsuits.  The plaintiffs argued that the approved findings from Phase I establish that the tobacco companies breached a duty of care and failed to disclose material information to every member of the Engle class.  See Brown, 611 F.3d at 1329.  The tobacco companies argued that, although the jury in Phase I found that they acted negligently in some way or concealed some information, the findings are not specific enough to establish that they acted negligently in connection with any particular brand of cigarette or concealed material information from any particular plaintiff.

We were the first appellate court to consider the res judicata effect of the approved findings from Phase I, and we concluded that the findings have preclusive effect in a later case only when the plaintiff can establish that the jury in Phase I actually decided that a tobacco company acted wrongfully regarding cigarettes that the plaintiff smoked.  Brown, 611 F.3d at 1336.  We explained that, when the Supreme Court of Florida stated in Engle that the approved findings from Phase I "were to have res judicata effect," the court "necessarily refer[red] to issue preclusion" and not claim preclusion because "factual issues and not causes of action were decided in Phase I."  Id. at 1333.  We explained that issue preclusion

10

applies only to issues that were "actually decided" in a prior litigation, and we remanded the matter for the district court to consider in the first instance whether the approved findings from Phase I establish that the tobacco companies acted wrongfully toward each plaintiff. Id. at 1334–35. We explained that, to determine whether a specific factual issue was determined in favor of the plaintiff, the district court should look beyond the face of the verdict and consider "[t]he entire trial record." Id. at 1334–36. The tobacco companies argued in that appeal that "using the findings to establish facts that were not decided by the jury would violate their due process rights," but we avoided that question because, "under Florida law[,] the findings could not be used for that purpose anyway." Id. at 1334.

Several Florida courts of appeal then held that the approved findings from Phase I establish the conduct elements of the each class member's claims against the tobacco companies, and they rejected our decision in Brown that smokers must establish from the trial record that an issue was actually decided in his or her favor. See Frazier v. Philip Morris USA Inc., 89 So. 3d 937, 947 (Fla. 3d Dist. Ct. App. 2012); Philip Morris USA, Inc. v. Douglas, 83 So. 3d 1002, 1010 (Fla. 2d Dist. Ct. App. 2012); R.J. Reynolds Tobacco Co. v. Brown, 70 So. 3d 707, 715 (Fla. 4th Dist. Ct. App. 2011); R.J. Reynolds Tobacco Co. v. Martin, 53 So. 3d 1060, 1066–67 (Fla. 1st Dist. Ct. App. 2010). In Martin, the court disagreed with our decision in Brown that "every Engle plaintiff must trot out the class action trial transcript to

11

prove applicability of the Phase I findings." Martin, 53 So. 3d at 1067. The court held, "No matter the wording of the findings on the Phase I verdict form, the jury considered and determined specific matters related to the defendants' conduct. Because the findings are common to all class members, [the plaintiff] . . . was entitled to rely on them in her damages action against [R.J. Reynolds]." Id. For example, the plaintiff in Martin brought a claim for fraudulent concealment, and the court held that the Phase I finding about concealment "encompassed all the brands" and that R.J. Reynolds could not relitigate whether it had concealed any material information. Id. at 1068.

Because federal courts sitting in diversity are bound by the decisions of state courts on matters of state law, those decisions of the Florida courts of appeal supplanted our interpretation of Florida law in Brown. See Allstate Life Ins. Co. v. Miller, 424 F.3d 1113, 1116 (11th Cir. 2005) (explaining that "in diversity cases we are required to adhere to the decisions of the Florida appellate courts absent some persuasive indication that the Florida Supreme Court would decide the issue otherwise"). The tobacco companies could no longer argue that the approved findings from Phase I have no preclusive effect as a matter of Florida law. Instead, they argued that giving the approved findings preclusive effect would violate their federal rights to due process. The tobacco companies raised that argument in each

12

of the cases filed in the district court, which consolidated those cases in Waggoner

v. R.J. Reynolds Tobacco Co., 835 F. Supp. 2d 1244 (M.D. Fla. 2011).

The district court in Waggoner held that giving preclusive effect to the

approved findings from Phase I does not violate a right of the tobacco companies

to due process of law. Id. at 1279. The district court concluded that "a state's

departure from common law issue preclusion principles does not implicate the

Constitution unless that departure also violates 'the minimum procedural

requirements of the Fourteenth Amendment's Due Process Clause.'" Id. at 1270

(quoting Kremer v. Chem. Constr. Corp., 456 U.S. 461, 481, 102 S. Ct. 1883, 1897

(1982)). And the district court concluded that the decisions of the Florida courts of

appeal do not violate those procedural requirements because those decisions do not

arbitrarily deprive the tobacco companies of property, Waggoner, 835 F. Supp. 2d

at 1272–74, and because the tobacco companies had a full and fair opportunity to

litigate the conduct elements at Phase I of the class action, id. at 1274–77.

After the district court decided Waggoner, the Supreme Court of Florida in

Douglas held, as a matter of Florida law, that the approved findings from Phase I

establish the conduct elements of the claims brought by members of the Engle

class. Douglas, 110 So. 3d at 428. The court acknowledged that "the Engle jury

did not make detailed findings for which evidence it relied upon to make the Phase

I common liability findings." Id. at 433. But the court explained that, "[n]o matter

13

the wording of the findings on the Phase I verdict form, the jury considered and determined specific matters related to the [Engle] defendants' conduct." Id. (quoting Martin, 53 So. 3d at 1067) (second alteration in original). The court explained that, although the proof submitted at the Phase I trial included both general and brand-specific defects, "the class action jury was not asked to find brand-specific defects in the Engle defendants' cigarettes," but only to "determine 'all common liability issues' for the class." Id. at 423. The court concluded that the approved findings from Phase I concern conduct that "is common to all class members and will not change from case to case," and that "the approved Phase I findings are specific enough" to establish some elements of the plaintiffs' claims. Id. at 428.

The Supreme Court of Florida also held in Douglas that giving preclusive effect to the approved findings from Phase I does not violate a right of the tobacco companies to due process. Id. at 430. The court stated that the tobacco companies had notice and an opportunity to be heard and were not arbitrarily deprived of property. Id. at 431–32. The court explained that, when it stated in Engle that the approved findings have "res judicata effect," it addressed claim preclusion, not issue preclusion. Id. at 432. The court stated that claim preclusion "prevents the same parties from relitigating the same cause of action in a second lawsuit," id. at 432, while issue preclusion "prevents the same parties from relitigating the same

14

issues that were litigated and actually decided in a second suit involving a different cause of action," id. at 433. "Because the claims in Engle and the claims in individual actions like this case are the same causes of action between the same parties," the court concluded that "res judicata (not issue preclusion) applies." Id. at 432. The court stated that "to decide here that we really meant issue preclusion even though we said res judicata in Engle would effectively make the Phase I findings regarding the Engle defendants' conduct useless in individual actions." Id. at 433.

The tobacco companies had argued that, based on Fayerweather v. Ritch, 195 U.S. 276, 25 S. Ct. 58 (1904), they had a constitutional right to have issue preclusion apply to the approved findings from Phase I, but the Supreme Court of Florida rejected this argument. Douglas, 110 So. 3d at 435. The court stated that, "as a constitutional matter, the Engle defendants do not have the right to have issue preclusion, as opposed to res judicata, apply to the Phase I findings." Id. The court explained that "claim preclusion, unlike issue preclusion, has no 'actually decided' requirement but, instead, focuses on whether a party is attempting to relitigate the same claim, without regard to the arguments or evidence that were presented to the first jury that decided the claim." Id. The court concluded that, because it was applying claim preclusion instead of issue preclusion, the "decision

15

in Fayerweather does not impose a constitutional impediment against giving the Phase I findings res judicata effect." Id.

In this appeal, R.J. Reynolds challenges the decision of the district court in Waggoner and appeals the jury verdicts in favor of two plaintiffs, Alvin Walker and George Duke III. Walker filed an amended complaint in federal court for the death of his father, Albert Walker, and Duke filed an amended complaint in federal court for the death of his mother, Sarah Duke. Walker and Duke asserted claims for strict liability, negligence, fraudulent concealment, and conspiracy to fraudulently conceal. The juries decided those cases after the district court decided Waggoner, but before the Supreme Court of Florida decided Douglas. In both cases, the district court instructed each jury that, under the decision in Waggoner, the jury in Phase I conclusively established the tortious-conduct elements of the plaintiffs' claims. The district court instructed the juries that R.J. Reynolds "placed cigarettes on the market that were defective and unreasonably dangerous" and that R.J. Reynolds "was negligent." The only issues for those juries to resolve were whether the decedents were members of the Engle class, causation, and damages. The juries in both cases returned split verdicts. The jury found in favor of Walker on the claims of strict liability and negligence, allocated 10 percent of the fault to R.J. Reynolds and 90 percent of the fault to Walker, and entered a judgment of $27,500. The jury found in favor of Duke only on the claim of strict

liability, allocated 25 percent of the fault to R.J. Reynolds and 75 percent of the fault to Duke, and entered a judgment of $7,676.25.

## II.    STANDARD OF REVIEW

"We review questions of constitutional law de novo."  Nichols v. Hopper, 173 F.3d 820, 822 (11th Cir. 1999).

## III.    DISCUSSION

The Full Faith and Credit Act, 28 U.S.C. § 1738, requires federal courts to "give preclusive effect to a state court judgment to the same extent as would courts of the state in which the judgment was entered."  Kahn v. Smith Barney Shearson Inc., 115 F.3d 930, 933 (11th Cir. 1997) (quoting Battle v. Liberty Nat'l Life Ins. Co., 877 F. 2d 877, 882 (11th Cir. 1989)).  But the Act, like all statutes, is "subject to the requirements of . . . the Due Process Clause."  Marrese v. Am. Acad. of Orthopaedic Surgeons, 470 U.S. 373, 380, 105 S. Ct. 1327, 1332 (1985).  And the law of preclusion is also "subject to due process limitations."  See Taylor v. Sturgell, 553 U.S. 880, 891, 128 S. Ct. 2161, 2171 (2008).  Although "[s]tate courts are generally free to develop their own rules for protecting against the relitigation of common issues or the piecemeal resolution of disputes[,] . . . extreme applications of the doctrine of res judicata may be inconsistent with a federal right that is fundamental in character."  Richards v. Jefferson Cnty., Ala., 517 U.S. 793, 797, 116 S. Ct. 1761, 1765 (1996) (internal quotation marks

omitted). These principles require that we give full faith and credit to the decision in Engle, as interpreted in Douglas, so long as it "satisf[ies] the minimum procedural requirements" of due process. Kremer, 456 U.S. at 481, 102 S. Ct. at 1897. R.J. Reynolds argues that this appeal is governed by the Due Process Clause of the Fifth Amendment, but in the district court they argued that the case was governed by the Due Process Clause of the Fourteenth Amendment. See Waggoner, 835 F. Supp. 2d at 1271. Our analysis is the same under either clause because "the reaches of the [Due Process Clauses of the] Fourteenth and Fifth Amendments are coextensive." Rodriguez–Mora v. Baker, 792 F.2d 1524, 1526 (11th Cir. 1986).

Our inquiry is a narrow one: whether giving full faith and credit to the decision in Engle, as interpreted in Douglas, would arbitrarily deprive R.J. Reynolds of its property without due process of law. See Corp. of Presiding Bishop of Church of Jesus Christ of Latter–Day Saints v. Hodel, 830 F.2d 374, 380 (D.C. Cir. 1987) (holding that the decision of a prior court on a question of preclusion law did not violate due process because it was not arbitrary). R.J. Reynolds argues that we should conduct a searching review of the Engle class action and apply what amounts to de novo review of the analysis of Florida law in Douglas, but we lack the power to do so. Our task is not to decide whether the decision in Douglas was correct as a matter of Florida law. See Erie R.R. Co. v.

18

Tompkins, 304 U.S. 64, 78, 58 S. Ct. 817, 822 (1938).  And we cannot refuse to give full faith and credit to the decision in Engle because we disagree with the decision in Douglas about what the jury in Phase I decided.  See Am. Ry. Express Co. v. Kentucky, 273 U.S. 269, 273, 47 S. Ct. 353, 355 (1927) ("It is firmly established that a merely erroneous decision given by a state court in the regular course of judicial proceedings does not deprive the unsuccessful party of property without due process of law.").

The decision of the Supreme Court of Florida to give preclusive effect to the approved findings from Phase I did not arbitrarily deprive R.J. Reynolds of property without due process of law.  The Supreme Court of Florida looked through the jury verdict entered in Phase I to determine what issues the jury decided.  Based on its review of the class action trial plan and the jury instructions, the court concluded that the jury had been presented with arguments that the tobacco companies acted wrongfully toward all the plaintiffs and that all cigarettes that contain nicotine are addictive and produce dependence.  Douglas, 110 So. 3d at 423.  Although the proof submitted to the jury included both general and brand-specific defects, the court concluded that the jury was asked only to "determine 'all common liability issues' for the class," not brand specific defects.  Id.  The Supreme Court of Florida was entitled to look beyond the jury verdict to determine what issues the jury decided.  See Fayerweather, 195 U.S. at 308, 25 S. Ct. at 68

19

(explaining that courts may look beyond a general verdict to the "entire record of the case" to determine what issues were decided in a prior litigation); Russell v. Place, 94 U.S. 606, 610, 606 (1876) (explaining that, although "an estoppel must 'be certain to every intent,'" the "uncertainty [may] be removed by extrinsic evidence showing the precise point involved and determined"); Precision Air Parts, Inc. v. Avco Corp., 736 F.2d 1499, 1502 (11th Cir. 1984) (looking beyond the face of a prior judicial opinion to "examine the record as a whole" and determine those issues that the finder of fact actually decided); 18 Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice and Procedure § 4420 at 520 (2d ed. 2002) (explaining that "the first step in resolving uncertainty as to the identity of the issues actually decided lies in painstaking examination of the record of the prior action").  We sanctioned a similar inquiry in Brown, where we stated that, although the jury verdict in Phase I was ambiguous on its face, members of the Engle class should be allowed an opportunity to establish that the jury in Phase I actually decided particular issues in their favor.  Brown, 611 F.3d at 1335.  We ordinarily presume that a jury followed its instructions, see United States v. Stone, 9 F.3d 934, 940 (11th Cir. 1993), and the Supreme Court of Florida did not act arbitrarily when it applied this presumption and concluded that the jury found only issues of common liability.

The decision of the Supreme Court of Florida in Douglas is consistent with its earlier decision in Engle. In Engle, the Supreme Court of Florida explained that the approved findings from Phase I "will have res judicata effect" in the later individual cases. Engle, 945 So. 2d at 1269. But the court did not approve all of the findings from Phase I. Instead, the court stated that the findings of the jury in Phase I about fraud and intentional infliction of emotional distress cannot have preclusive effect because "the non-specific findings in favor of the plaintiffs" on those questions were "inadequate to allow a subsequent jury to consider individual questions of reliance and legal cause." Id. at 1255. That the court in Engle denied preclusive effect to those findings on the ground that they were not specific enough suggests that the court determined that the jury findings about the other claims were specific enough to apply in favor of every class plaintiff. See Douglas, 110 So.3d at 428 (explaining that, "by accepting some of the Phase I findings and rejecting others based on lack of specificity, this Court in Engle necessarily decided that the approved Phase I findings are specific enough").

R.J. Reynolds had a full and fair opportunity to litigate the issues of common liability in Phase I. "The opportunity to be heard is an essential requisite of due process of law in judicial proceedings." Richards, 517 U.S. at 797 n.4, 116 S. Ct. at 1765 n.4. During Phase I, R.J. Reynolds had an opportunity to contest its liability and challenge the verdict form that the trial court submitted to the jury.

21

After the trial court declined to adopt the jury verdict form proposed by the tobacco companies and the jury decided against the tobacco companies on the issues of common liability, R.J. Reynolds challenged those decisions before the Supreme Court of Florida, but that court rejected its arguments. See Engle, 945 So. 2d at 1254–55. And R.J. Reynolds petitioned the Supreme Court of the United States to review the decision of the Supreme Court of Florida, but the Supreme Court of the United States denied its petition. See R.J. Reynolds Tobacco Co. v. Engle, 552 U.S. 941, 128 S. Ct. 96 (2007) (denying the petition for writ of certiorari).

R.J. Reynolds also has had an opportunity to contest its liability in these later cases brought by individual members of the Engle class. Although R.J. Reynolds has exhausted its opportunities to contest the common liability findings of the jury in Phase I, it has vigorously contested the remaining elements of the claims, including causation and damages. The modest sums received by the plaintiffs in this appeal—less than $28,000 for Walker and less than $8,000 for Duke—suggest that the juries fairly considered the questions of damages and fault.

R.J. Reynolds argues that "traditional practice provides a touchstone for constitutional analysis" under the Due Process Clause, Honda Motor Co., Ltd. v. Oberg, 512 U.S. 415, 430, 114 S. Ct. 2331, 2339 (1994), and that the decision in Douglas extinguishes the protection against arbitrary deprivations of property

22

embodied in the federal common law of issue preclusion, which bars relitigation only of "issues actually decided in a prior action." See Gjellum v. City of Birmingham, Ala., 829 F.2d 1056, 1059 (11th Cir. 1987) (emphasis added). R.J. Reynolds fails to identify any court that has ever held that due process requires application of the federal common law of issue preclusion. Nor does R.J. Reynolds identify any other court that has declined to give full faith and credit to a judgment of a state court as later interpreted by the same state court on the ground that the later state court decision was so wrong that it amounted to a violation of due process.

R.J. Reynolds argues that the Supreme Court held in Fayerweather, 195 U.S. at 299, 25 S. Ct. at 64, that parties have a right, under the Due Process Clause, to the application of the traditional law of issue preclusion, but we disagree. The Supreme Court stated in Fayerweather that the Due Process Clause is implicated when a party argues that a court has given preclusive effect to an issue that was not actually decided in a prior litigation. Id. But the Supreme Court held that no violation of the Due Process Clause had occurred because the issue had been actually decided in the prior litigation. Id. at 301, 308, 25 S. Ct. at 65, 68. The Supreme Court had no occasion in Fayerweather to decide what sorts of applications of issue preclusion would violate due process.

23

R.J. Reynolds next argues that it is impossible to tell whether the jury determined that it acted wrongfully in connection with some or all of its brands of cigarettes because the plaintiffs presented both general and brand-specific theories of liability, but the decision of the Supreme Court of Florida forecloses that argument. Whether a jury actually decided an issue is a question of fact, see Starr Tyme, Inc. v. Cohen, 659 So. 2d 1064, 1068 (Fla. 1995), and the Supreme Court of Florida looked past the ambiguous jury verdict to decide this question of fact.

If due process requires a finding that an issue was actually decided, then the Supreme Court of Florida made the necessary finding when it explained that the approved findings from Phase I "go to the defendants underlying conduct which is common to all class members and will not change from case to case" and that "the approved Phase I findings are specific enough" to establish certain elements of the plaintiffs' claims. Douglas, 110 So. 3d at 428. Labeling the relevant doctrine as claim preclusion instead of issue preclusion may be unorthodox and inconsistent with the federal common law about those doctrines, but the Supreme Court has instructed us that, "[i]n determining what is due process of law, regard must be had to substance, not to form." Fayerweather, 195 U.S. at 297, 25 S. Ct. at 64 (quotation marks omitted). "State courts are free to attach such descriptive labels to litigations before them as they may choose and to attribute to them such consequences as they think appropriate under state constitutions and laws, subject

24

only to the requirements of the Constitution of the United States." Hansberry v. Lee, 311 U.S. 32, 40, 61 S. Ct. 115, 117 (1940). Our deference to the decision in Douglas does not violate the constitutional right of R.J. Reynolds to due process of law. Whether the Supreme Court of Florida calls the relevant doctrine issue preclusion, claim preclusion, or something else, is no concern of ours.

We must give full faith and credit to the decision of the Supreme Court of Florida about how to resolve this latest chapter of the intractable problem of tobacco litigation. For several decades, R.J. Reynolds and the other major companies of the tobacco industry have "remained under the long shadow of litigation, that chronic potential spoiler of their financial well-being." Richard Kluger, Ashes to Ashes: America's Hundred-Year Cigarette War, the Public Health, and the Unabashed Triumph of Philip Morris 760 (1996). "The tobacco industry was primed to meet these ever larger challenges as a cost of doing business, and it did not lack for plausible, even persuasive, defenses." Id. Courts, after all, long ago recognized the inherent risks of cigarette smoking. See, e.g., Austin v. State, 48 S.W. 305, 306 (Tenn. 1898) (Cigarettes are "wholly noxious and deleterious to health. Their use is always harmful, never beneficial. They possess no virtue, but are inherently bad, and bad only."). And physicians "suspected a link between smoking and illness for centuries." Cipollone v. Liggett Grp., Inc., 505 U.S. 504, 513, 112 S. Ct. 2608, 2615 (1992). In 1604, King James I

25

wrote "A Counterblaste to Tobacco," that described smoking as "a custom loathsome to the eye, hateful to the nose, harmful to the brain, dangerous to the lung, and the black stinking fume thereof, nearest resembling the horribly Stygian smoke of the pit that is bottomless." See Kluger, supra, at 15 (quoting "A Counterblaste to Tobacco"). And popular culture too recognized those risks. See, e.g., Tex Williams, "Smoke! Smoke! Smoke! (That Cigarette)" (Capitol Records 1947) ("Smoke, smoke, smoke that cigarette. / Puff, puff, puff, and if you smoke yourself to death, / Tell Saint Peter at the Golden Gate / That you hate to make him wait / But you've just got to have another cigarette."). So juries often either discounted or rejected the claims of smokers who sought to hold tobacco companies liable for the well-known harms to their health caused by smoking. But a "wave of suits, brought by resourceful attorneys representing vast claimant pools," Kluger, supra, at 760, continued. We cannot say that the procedures, however novel, adopted by the Supreme Court of Florida to manage thousands of these suits under Florida law violated the federal right of R.J. Reynolds to due process of law.

## IV.    CONCLUSION

We **AFFIRM** the judgments against R.J. Reynolds and in favor of Walker and Duke.

26