[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-14590
_____

D.C. Docket No. 3:09-cv-13602-MMH-JBT


EARL E. GRAHAM,
as PR of Faye Dale Graham, deceased,

                                                    Plaintiff - Appellee,

versus

R.J. REYNOLDS TOBACCO COMPANY,
individually and as successor by merger to the Brown and
Williamson Tobacco Corporation and The American Tobacco
Company,
PHILIP MORRIS USA, INC.,

                                                    Defendants - Appellants,

LORILLARD TOBACCO COMPANY, et al.,

                                                    Defendants.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____
(April 8, 2015)

Before TJOFLAT, JILL PRYOR and COX, Circuit Judges.

TJOFLAT, Circuit Judge:

In 1996, a Florida District Court of Appeal approved certification of a class-action lawsuit originating in the Circuit Court of Dade County that encompassed an estimated 700,000 Floridians who brought state-law damages claims against the major American tobacco companies for medical conditions, including cancer, "caused by their addiction to cigarettes that contain nicotine." *R.J. Reynolds Tobacco Co. v. Engle* ("*Engle I*"), 672 So. 2d 39, 40 (Fla. 3d Dist. Ct. App. 1996) (quotation marks omitted).  A year-long, class-wide trial was conducted on the issue of liability, and "the jury rendered a verdict for the class on all counts." *Liggett Grp. Inc. v. Engle* ("*Engle II*"), 853 So. 2d 434, 441 (Fla. 3d Dist. Ct. App. 2003).  The Florida Supreme Court then decertified the class but held that the jury findings would nonetheless have "res judicata effect" in cases thereafter brought against one or more of the tobacco companies by a former class member.  *Engle v. Liggett Grp. Inc.* ("*Engle III*"), 945 So. 2d 1246, 1269 (Fla. 2006) (per curiam).

Here, a member of that now-decertified class—a so-called *Engle*-progeny plaintiff—successfully advanced strict-liability and negligence claims that trace their roots to the original *Engle* jury findings.  Over the defendants' objection, the District Court instructed the jury that "you must apply certain findings made by the *Engle* court and they must carry the same weight they would have if you had

2

listened to all the evidence and made those findings yourselves." Among them: that the defendants "placed cigarettes on the market that were defective and unreasonably dangerous" and that "all of the *Engle* [d]efendants were negligent."

When the jury found in favor of the plaintiff on both claims, the defendants renewed their motion for a judgment as a matter of law, contending, among other things, that federal law preempted the jury's imposition of tort liability as based on the *Engle* jury findings. The District Court denied the motion, and the defendants appealed. We must decide whether federal law preempts this suit because it stands as an obstacle to the purposes and objectives of Congress.

## I.

### A.

Like so many of her generation, Faye Graham started each morning with a cup of coffee and a smoke. By day's end, she usually burned through one-and-a-half to two packs of cigarettes. According to her brother, "she smoked right on up until she wasn't able to smoke." Doctors diagnosed Graham with non-small cell lung cancer. She died on November 18, 1993, at age fifty-eight.

Faye was survived by her husband, Earl Graham, a tugboat captain. He filed, as personal representative of his wife's estate, a wrongful-death suit against R.J. Reynolds Tobacco Co. and Phillip Morris USA, Inc. ("R.J. Reynolds" and

"Phillip Morris")[1] in the United States District Court for the Middle District of Florida.[2]  Among other things, the complaint alleged that Faye Graham was addicted to cigarettes manufactured by the defendants and that the addiction caused her death.  The complaint contained seven counts, two of which are relevant to this appeal: a strict-liability claim, based on the fact that "the cigarettes sold and placed on the market by [the defendants] were defective and unreasonably dangerous," and a negligence claim, based on the fact that the defendants were negligent

[1] Graham's first-amended complaint included as defendants Lorillard Tobacco Co. and Liggett Group LLC, but his claims against them were subsequently dismissed with prejudice during the course of the litigation.  R.J. Reynolds and Phillip Morris are the only two tobacco companies that remain involved in the lawsuit.

[2] The Florida Wrongful Death Act provides that

> [w]hen the death of a person is caused by the wrongful act, negligence, default, or breach of contract or warranty of any person, . . . and the event would have entitled the person injured to maintain an action and recover damages if death had not ensued, the person . . . that would have been liable in damages if death had not ensued shall be liable for damages as specified in this act notwithstanding the death of the person injured . . . .

Fla. Stat. § 768.19.  The statute specifies that "[t]he action shall be brought by the decedent's personal representative, who shall recover for the benefit of the decedent's survivors and estate all damages . . . caused by the injury resulting in death." *Id*. § 768.20.  Damages recoverable under the Act center on the injuries suffered by the decedent's survivors—not the decedent—and include the survivor's "(1) loss of past and future support and services; (2) loss of companionship and protection; and (3) . . . mental pain and suffering from the date of the injury." *Martin v. United Sec. Servs., Inc.*, 314 So. 2d 765, 769 (Fla. 1975).

Graham's second-amended complaint also sought damages under the Florida Survival Statute.  That statue permits a decedent's personal representative to recover on the basis of the decedent's pain and suffering, medical expenses, and loss of earnings, among other things.  Fla. Stat. § 46.021; *see also Martin*, 314 So.2d at 767.  The District Court held that Graham could not pursue an "independent" survival claim—that is, separate and apart from his wrongful-death claim—because he had reframed it as such "without leave of the Court and after discovery had closed."  Graham was permitted, however, to pursue his claim under the Survival Statute in the alternative.  The parties stipulated before trial that Graham's case was to be litigated as a wrongful-death suit.

4

"[w]ith respect to smoking and health and the manufacture, marketing and sale of their cigarettes."

### B.

### 1.

This is no ordinary tort suit, however: Graham's is an *Engle*-progeny case. The *Engle* litigation epic began in 1994, when six Floridians filed a putative class-action lawsuit seeking over $100 billion in both compensatory and punitive damages against the major domestic tobacco companies: Philip Morris, Inc.; R.J. Reynolds Tobacco Co.; Brown & Williamson Tobacco Co., individually and as successor by merger to The American Tobacco Company; Lorillard Tobacco Co.; and Liggett Group, Inc. *Engle II*, 853 So. 2d at 441 & n.1. Two years after the plaintiffs filed their initial complaint, the Third District Court of Appeal approved class certification on interlocutory appeal, defining the class as "all Florida citizens and residents" "and their survivors, who have suffered, presently suffer or who have died from diseases and medical conditions caused by their addiction to cigarettes that contain nicotine." *Engle I*, 672 So. 2d at 40, 42 (alteration omitted) (quotation marks omitted). The class included an estimated 700,000 members. *Engle II*, 853 So. 2d at 442.

The trial court charged with managing this class action devised a trial plan consisting of three phases. In Phase I, the court conducted a year-long trial on

"common issues relating exclusively to defendants' conduct and the general health effects of smoking." *Id.* at 441. At the trial's conclusion, "the jury rendered a verdict for the class on all counts." *Id.*

To reach that verdict, the jury answered special interrogatories submitted by the Phase I trial court, at least two of which concerned the claims litigated here: First, did each tobacco company "place cigarettes on the market that were defective and unreasonably dangerous"? *Walker v. R.J. Reynolds Tobacco Co.*, 734 F.3d 1278, 1282 (11th Cir. 2013). And second, did each tobacco company "fail to exercise the degree of care which a reasonable cigarette manufacturer would exercise under like circumstances"? *Id.* (alteration omitted). The tobacco companies argued that these questions "did not ask for specifics about the tortious conduct of the tobacco companies, rendering the jury findings useless for application to individual plaintiffs." *Id.* (alterations omitted) (quotation marks omitted). But the trial court overruled their objection, and the jury answered "yes" to both questions. *Id.*

In Phase II, the same jury found the tobacco companies liable for the injuries of three class representatives, awarded them compensatory damages of $12.7 million, and calculated punitive damages for the entire class to be $145 billion. *Engle II*, 853 So. 2d at 441. Before the trial reached Phase III, in which new juries were to have decided individual causation and damages claims for the 700,000

6

class members, *id.* at 442, the Third District Court of Appeal decertified the class and vacated the class-wide punitive-damages award, *id.* at 450, 456.

The class appealed, and the Florida Supreme Court affirmed the Third District Court of Appeal's decision to decertify the class and to vacate the punitive-damages award.[3] *Engle III*, 945 So. 2d at 1268 (explaining that "continued class action treatment . . . is not feasible because individualized issues such as legal causation, comparative fault, and damages predominate"). Following decertification, the court reasoned that "[c]lass members can choose to initiate individual damages actions and the Phase I common core findings . . . will have res judicata effect in those trials." *Id.* at 1269. In particular, the Florida Supreme Court approved affording the following Phase I findings res judicata effect:

> (i) [T]hat smoking cigarettes causes certain named diseases including COPD and lung cancer; (ii) that nicotine in cigarettes is addictive; (iii) that the *Engle* defendants placed cigarettes on the market that were defective and unreasonably dangerous; (iv) that the *Engle* defendants concealed or omitted material information not otherwise known or available knowing that the material was false or misleading or failed to disclose a material fact concerning the health effects or addictive nature of smoking cigarettes or both; (v) that the *Engle* defendants agreed to conceal or omit information regarding the health effects of cigarettes or their addictive nature with the intention that smokers and the public would rely on this information to their detriment; (vi) that all of the *Engle* defendants sold or supplied cigarettes that were defective; (vii) that all of the *Engle* defendants sold or supplied cigarettes that, at the time of sale or supply, did not conform to

---

[3] The Florida Supreme Court also reversed the Third District Court of Appeal's decision on several other grounds not relevant to our discussion. *See Engle v. Liggett Grp., Inc.*, 945 So. 2d 1246, 1276–77 (Fla. 2006).

7

representations of fact made by said defendants; and (viii) that all of the *Engle* defendants were negligent.

*Phillip Morris USA, Inc. v. Douglas*, 110 So. 3d 419, 424–25 (Fla. 2013) (alterations omitted) (footnote omitted) (quotation marks omitted) (quoting *Engle III*, 945 So. 2d at 1276–77 (Fla. 2006)).  But what, exactly, does that mean?

2.

After the Florida Supreme Court decided *Engle III*, individual members of the defunct class scattered, making their way into both state and federal courts. Uncertainty about the Phase I findings abounded.  In fact, three Florida District Courts of Appeal, joined by the United States District Court for the Middle District of Florida and a panel of our court, produced a four-way split as to how the Phase I findings should inform *Engle*-progeny cases in light of *Engle III*.  The disagreement centered on two open questions: first, whether *Engle III*'s use of the term "res judicata" referred to issue preclusion or claim preclusion; and second, how juries should assess the causation element of an *Engle*-progeny plaintiff's claim.

a.

Our court issued the first opinion on the subject.  In *Brown v. R.J. Reynolds Tobacco Co.*, 611 F.3d 1324 (11th Cir. 2010), we recognized that the term "res judicata" can refer to "claim preclusion, to issue preclusion, or to both." *Id.* at 1332.  We understood *Engle III* as referring to issue, not claim, preclusion

8

"[b]ecause factual issues and not causes of action were decided in Phase I." *Id.* at 1333. Noting that "issue preclusion only operates to prevent the re-litigation of issues that were decided, or 'actually adjudicated,' between the parties in an earlier lawsuit," *id.* at 1334 (citation omitted), we permitted an *Engle*-progeny plaintiff to rely on the Phase I jury findings to the extent he could show "to a reasonable degree of certainty that the jury made the specific factual determination that is being asserted," *id.* at 1335.

To do so, an *Engle* plaintiff would bear the burden of rummaging through the Phase I trial record and identifying "specific parts of it to support [his] position." *Id.* But our court declined "to address whether [the Phase I] findings by themselves establish any elements of the plaintiffs' claims," observing only that such an inquiry would be "premature" "[u]ntil the scope of the factual issues decided in the Phase I approved findings is determined." *Id.* at 1336. We directed the district court on remand

> to determine, for example, whether the jury's [strict-liability finding] establishes only that the defendants sold some cigarettes that were defective and unreasonably dangerous, or whether the plaintiffs have carried their burden of showing to a reasonable degree of certainty that it also establishes that all of the cigarettes that the defendants sold fit that description.

*Id.* We eyed this task skeptically, though, noting that "plaintiffs have pointed to nothing in the record, and there is certainly nothing in the jury findings themselves" to support the conclusion that "all cigarettes the defendants sold were

9

defective and unreasonably dangerous because there is nothing to suggest that any type or brand of cigarette is any safer or less dangerous than any other type or brand." *Id.* at 1335.

b.

The First District Court of Appeal disagreed. *R.J. Reynolds Tobacco Co. v. Martin*, 53 So. 3d 1060, 1067 (Fla. 1st Dist. Ct. App. 2010). The First District found it unnecessary to distinguish between claim and issue preclusion and held that an *Engle* plaintiff need not "trot out the class action trial transcript to prove applicability of the Phase I findings." *Id.* As a result, "[t]he common issues, which the [Phase I] jury decided *in favor of the class,* were the 'conduct' elements of the claims asserted by the class, and not simply . . . a collection of facts *relevant* to those elements." *Id.* Under this reading, a plaintiff thus had no burden to prove, to a reasonable degree of certainty, that the Phase I jury had actually decided the factual issue relevant to his claim—for example, how the cigarettes that the plaintiff smoked were defective or negligently designed.

The *Martin* court supported this conclusion by referencing the Final Judgment and Amended Omnibus Order entered by the Phase I trial judge in denying the tobacco companies' motion for a directed verdict. *Id.* at 1068 (citing *Engle v. R.J. Reynolds Tobacco Co.* ("*Engle F.J.*"), No. 94-08273 CA-22, 2000 WL 33534572, at *1 (Fla. Cir. Ct. Nov. 6, 2000)). The *Martin* court read *Engle*

10

*F.J.* to "set[] out the evidentiary foundation for the Phase I jury's findings . . . and demonstrate[] that the verdict is conclusive as to the conduct elements of the claims." *Id.*[4] This meant that "individual *Engle* plaintiffs need not independently prove up those elements [established by the Phase I findings] or demonstrate the relevance of the findings to their lawsuits, assuming they assert the same claims raised in the class action." *Id.* at 1069. In short, the plaintiffs had already proved the duty and breach elements of their tort claims.

---

[4] As to the strict-liability claim, the trial court wrote that the evidence presented at trial

> was more than sufficient . . . to support the jury verdict that cigarettes manufactured and placed on the market by the defendants were defective in many ways including the fact that the cigarettes contained many carcinogens, nitrosamines, and other deleterious compounds such as carbon monoxide. That levels of nicotine were manipulated, sometime by utilization of ammonia to achieve a desired "free basing effect" of pure nicotine to the brain, and sometime by using a higher nicotine content tobacco called Y-1, and by other means such as manipulation of the levels of tar and nicotine [sic]. The evidence more than sufficiently proved that nicotine is an addictive substance which when combined with other deleterious properties, made the cigarette unreasonably dangerous. The evidence also showed some cigarettes were manufactured with the breathing air holes in the filter being too close to the lips so that they were covered by the smoker thereby increasing the amount of the deleterious effect of smoking the cigarette. There was also evidence at trial that some filters being test marketed utilize glass fibers that could produce disease and deleterious effects if inhaled by a smoker.

*Engle v. R.J. Reynolds Tobacco Co.* ("*Engle F.J.*"), No. 94-08273 CA-22, 2000 WL 33534572, at *2 (Fla. Cir. Ct. Nov. 6, 2000). The trial court went on to discuss the jury's findings regarding negligence:

> The [*Engle*] defendants according to the testimony, well knew from their own research, that cigarettes were harmful to health and were carcinogenic and addictive. [A]llowing the sale and distribution of said product under those circumstances without taking reasonable measures to prevent injury, constitutes . . . negligence.

*Id.* at *4.

11

As for causation, the *Martin* court affirmed the following jury instruction:

The first issue for your determination is whether [the plaintiff] was a member of the *Engle* class.  In order to be a member of the *Engle* class, the plaintiff must prove that [he] was addicted to R.J. Reynolds cigarettes containing nicotine, and, if so, that his addiction was the legal cause of his death.  Addiction is a legal cause of death if it directly and in a natural and continuous sequence produces or contributes substantially to producing such death so that it can reasonably be said that, but for the addiction to cigarettes containing nicotine, the death would not have occurred.

*Id.* at 1069 (alterations omitted) (quotation marks omitted).

c.

Less than a year after *Martin*, the Fourth District Court of Appeal joined the fray.  *R.J. Reynolds Tobacco Co. v. Jimmie Lee Brown*, 70 So. 3d 707 (Fla. 4th Dist. Ct. App. 2011).  *Jimmie Lee Brown* agreed with *Martin* that the Phase I findings were due res judicata effect; that is, they established the duty and breach elements of the plaintiffs' claims.  *Id.* at 715.  But it read *Martin* as "equating the legal causation instruction used on the issue of addiction with a finding of legal causation on the plaintiff's strict liability and negligence claims."  *Id.* at 716.  Membership in the *Engle* class, the court reasoned, was not enough to satisfy a plaintiff's burden of proof regarding the causation elements of a strict-liability or negligence action.  Instead, "a jury must be asked to determine (i) whether the defendant's failure to exercise reasonable care was a legal cause of decedent's

12

death; and (ii) whether the defective and unreasonably dangerous cigarettes were a legal cause of decedent's death." *Id.* at 715.

Pause to consider the difference between the causal inquiries proposed by *Martin* and *Jimmie Lee Brown*. In *Martin*, class membership and cause were essentially collapsed. *Martin* imposed no additional causal requirement beyond the class definition itself, namely, that a plaintiff's injuries be "caused by [his] addiction to cigarettes that contain nicotine." *Engle I*, 672 So. 2d at 40. Under *Martin*'s approach, an *Engle* plaintiff need only prove that his addiction to cigarettes caused his injury. He need not prove that the *defendants' conduct*—the defendants' defective product or the defendants' negligence, for example—was a legal cause of that injury as well. *Jimmie Lee Brown*'s approach demands more: for an *Engle* plaintiff to succeed on his claim, he must causally link specific tortious acts by the defendants to his injury.

d.

Enter the United States District Court for the Middle District of Florida. Faced with an *Engle*-progeny case after these three cases had been decided, the court first held that it was bound to give the Phase I findings the same preclusive effect as had *Martin* and *Jimmie Lee Brown*. *Waggoner v. R.J. Reynolds Tobacco Co.*, 835 F. Supp. 2d 1244, 1278 (M.D. Fla. 2011). It then considered whether doing so violated due process.

13

The tobacco companies argued that, because the plaintiffs pursued a number of different theories during the Phase I trial, it was impossible to discern which theory undergirded the jury's answers to the special interrogatories. For instance, when the jury said that all defendants placed cigarettes on the market that were defective and unreasonably dangerous, was that because the defendants sold cigarettes containing ammoniated tobacco? Or was it because the defendants sold cigarettes containing glass filter fibers? The jury could have answered "yes" to the first question for some defendants and "yes" to the second question for the others; "yes" to the first question and "no" to second; or "no" to the first question and "yes" to the second—the answer to the special interrogatory would have been the same. Under all three scenarios, the jury would have concluded that all defendants sold defective and unreasonably dangerous cigarettes. But no one could ever know which defendants produced which brand or brands of cigarettes with what defect or defects. And that result, the tobacco companies contended, stretched any application of res judicata past its constitutional breaking point. Although the District Court candidly admitted that "the *Engle* progeny litigation is unlike any this Court has seen or is likely to see again," *id.* at 1277, it rejected the defendants' due process argument, stressing that "[s]uch a unique situation demands some flexibility to accommodate the due process interests of *both* the Defendants *and* the thousands of *Engle* progeny plaintiffs," *id.*

14

Regarding causation, the court recognized that "plaintiffs' burden of proving causation is one of the primary procedural safeguards erected by the Florida Supreme Court in *Engle III*." *Id.* at 1278. The court therefore adopted the approach used in *Jimmie Lee Brown*—not *Martin*—as "the better way to proceed because it requires a specific causal link between Defendants' conduct and a progeny plaintiff's injuries and damages." *Id.* at 1279.

e.

The Second District Court of Appeal offered a final way of handling *Engle*-progeny claims: it split the difference between *Martin* and *Jimmie Lee Brown*'s disagreement about causation. *Phillip Morris USA, Inc. v. Douglas*, 83 So. 3d 1002 (Fla. 2d Dist. Ct. App. 2012). The court adopted *Martin*'s approach for the strict-liability claim. *Id.* at 1005 (approving a jury instruction directing the jury to determine "whether smoking cigarettes manufactured and sold by one or more of the defendants was a legal cause of the death of Decedent"). But the court held that the defendants were entitled to a more specific causal instruction on the negligence claim, much like the instruction approved in *Jimmie Lee Brown*. *Id.* at 1010 n.8 (faulting the trial court for failing to "ask the jury if it was the Tobacco Companies' failure to exercise reasonable care that was the legal cause of [the decedent's] injury"). At the same time, it certified to the Florida Supreme Court the constitutional question overhanging all *Engle*-progeny cases: whether res

15

judicata application of the Phase I findings comported with due process. *Id.* at 1011.

3.

The Florida Supreme Court resolved these conflicts in *Philip Morris USA, Inc. v. Douglas*, 110 So. 3d 419 (Fla. 2013). The court held that affording the Phase I findings res judicata effect was an application of claim preclusion, not issue preclusion. *Id.* at 432. An application of issue preclusion "would [have effectively made] the Phase I findings regarding the *Engle* defendants' conduct useless in individual actions." *Id.* at 433. That is because "[i]ssue preclusive effect is not given to issues which could have, but may not have, been decided in an earlier lawsuit between the parties." *Brown*, 611 F.3d at 1334 (collecting Florida cases applying issue preclusion's "actually adjudicated" requirement). Claim preclusion, by contrast, extends to issues actually decided in a prior litigation, as well as "every other matter which might with propriety have been litigated and determined in that action." *Douglas*, 110 So. 3d at 432 (quotation marks omitted). As a result, the court made clear that the Phase I findings were to be given claim-preclusive effect in subsequent trials and that the "conduct elements" of plaintiffs' tort claims—duty, breach, and "general causation"[5]—had already been

---

[5] The court defined general causation as "the connection between the *Engle* defendants' addictive cigarettes and the diseases in question." *Phillip Morris USA, Inc. v. Douglas*, 110 So. 3d 419, 428 (Fla. 2013).

conclusively established in favor of the class. *Id.* at 428. Although claim preclusion is generally understood to apply only upon issuance of a final judgment, *e.g.*, *Fla. Dept. of Transp. v. Juliano*, 801 So. 2d 101, 105 (Fla. 2001), *Douglas* held that the Phase I jury findings produced a "final judgment" in the sense that they resolved all common liability issues in favor of the class, *Douglas*, 110 So. 3d at 434.

The court went on to hold that affording the Phase I findings claim-preclusive effect did not violate due process. It reasoned that the tobacco companies were not entitled, under the Due Process Clause, to an application of issue, rather than claim, preclusion. And because claim preclusion, unlike issue preclusion, has no "actually decided" requirement, *Douglas* found that "there was competent substantial evidence to support the *Engle* defendants' common liability to the class," evidence of which the tobacco companies had notice and on which they had an opportunity to be heard during the Phase I trial. *Id.* at 433.

As for the causation issue, the court wholeheartedly embraced *Martin*'s approach. *Id.* at 428–29. The court rejected "the [tobacco companies'] argument that the Phase I findings are too general to establish . . . a causal connection between the *Engle* defendants' conduct and injuries proven to be caused by addiction to smoking their cigarettes." *Id.* at 429. All that remained to be litigated were "individual causation"—"the connection between the *Engle* defendant's

17

addictive cigarettes and the injury that an individual plaintiff actually sustained"—

and damages. *Id.* at 428. In other words, "to prevail on either strict liability or

negligence *Engle* claims, individual plaintiffs must establish (i) membership in the

*Engle* class; (ii) individual causation, i.e., that addiction to smoking the *Engle*

defendants' cigarettes containing nicotine was a legal cause of the injuries alleged;

and (iii) damages." *Id.* at 430.[6]

4.

The most recent chapter in the *Engle* litigation tome was written by this

court in *Walker v. R.J. Reynolds Tobacco Co.*, 734 F.3d 1278 (11th Cir. 2013). In

*Douglas*'s aftermath, the tobacco companies brought yet another due process

challenge to the res judicata effect of the Phase I findings.

They began their argument by agreeing with the Florida Supreme Court's

admission in *Douglas* that an application of issue preclusion to the Phase I findings

---

[6] The Florida Supreme Court described a typical *Engle*-progeny trial this way:

> [T]o gain the benefit of the Phase I findings in the first instance, individual plaintiffs must prove membership in the *Engle* class. . . . [P]roving class membership often hinges on the contested issue of whether the plaintiff smoked cigarettes because of addiction or for some other reason (like the reasons of stress relief, enjoyment of cigarettes, and weight control argued below). Once class membership is established, individual plaintiffs use the Phase I findings to prove the conduct elements of the six causes of action this Court upheld in *Engle*; however, for the strict liability and negligence claims at issue here, they must then prove individual causation and damages. If an individual plaintiff receives a favorable verdict, it is then subject to appellate review.

*Id.* at 431–32.

18

would render those findings "useless." That is because, under Florida preclusion law, issue-preclusive effect is only given to issues that were "actually decided" in a prior litigation. Because the Phase I findings could rest on any number of theories against any number of defendants, it is impossible to tell what was "actually decided." Any attempt to do so would violate due process. *See Fayerweather v. Ritch*, 195 U.S. 276, 307, 25 S. Ct. 58, 68, 49 L. Ed. 193 (1904) ("[W]here the evidence is that testimony was offered at the prior trial upon several distinct issues, the decision of any one of which would justify the verdict or judgment, then the conclusion must be that the prior decision is not an adjudication upon any particular issue or issues, and the plea of *res judicata* must fail.").

The tobacco companies charged *Douglas* with eliding this predicament entirely by relying on claim preclusion instead. Claim preclusion has no "actually decided" requirement, so the generic nature of the Phase I findings was not the obstacle it would have otherwise been under an issue-preclusion rubric. But this line of reasoning, the tobacco companies contended, was unpersuasive. First, claim preclusion has traditionally been understood as a defense. *Douglas*'s application of claim preclusion, by contrast, affords plaintiffs an offensive weapon against the tobacco companies by relieving the plaintiffs of their obligation to prove the duty and breach elements of their claims and by preventing the defendants from contesting the plaintiffs' proof on those claims. Second, claim

19

preclusion is relevant only when there has been a final judgment.  According to the

tobacco companies, the Phase I findings were not a final judgment because, by the

Florida Supreme Court's own admission, the Phase I jury "did not determine

whether the defendants were liable to anyone."  *Engle III*, 945 So. 2d at 1263

(quotation marks omitted).

The tobacco companies thus concluded that under either umbrella—claim

preclusion or issue preclusion—*Douglas* was soaked.  In their view, the decision

marked such an "extreme" departure from the doctrine of res judicata that it

violated due process of law.  *See Richards v. Jefferson Cnty.*, 517 U.S. 793, 797,

116 S. Ct. 1761, 1765, 135 L. Ed. 2d 76 (1996).[7]

*Walker* rejected these arguments.  First, it explained that the descriptive label

attached by the Florida Supreme Court to its application of res judicata carries little

weight.  How a state court describes a state-law doctrine is "no concern of ours."

*Walker*, 734 F.3d at 1289.  Second, it sought to ameliorate any due process

concerns surrounding *Douglas* by reframing the inquiry: "If due process requires a

finding that an issue was actually decided, then the Supreme Court of Florida made

the necessary finding when it explained that the approved findings from Phase I go

to the defendants underlying conduct which is common to all class members and

---

[7] For a more complete account of the arguments offered by the tobacco companies in *Walker*, see generally Consolidated Reply Brief of Appellant, *Walker v. R.J. Reynolds*, 734 F.3d 1278 (11th Cir. 2013) (No. 12-13500), 2013 WL 2288547.

20

will not change from case to case . . . ." *Id.* (citation omitted) (quotation marks omitted).

We take *Walker* to read *Douglas* to interpret the Phase I findings as involving only issues common to the class. Under this view, the brand-specific evidence presented to the Phase I jury matters not; that evidence is not common to the class. Different plaintiffs smoked different cigarettes with different defects over different periods of time. There is only one common issue we can be sure the Phase I jury "actually decided" as to the entire class: all plaintiffs smoked cigarettes containing nicotine that are addictive and cause disease. *Id.* at 1287 ("Based on [the Florida Supreme Court's] review of the class action trial plan and the jury instructions, the court concluded that the jury had been presented with arguments that the tobacco companies acted wrongfully toward all the plaintiffs and that all cigarettes that contain nicotine are addictive and produce dependence." (citing *Douglas*, 110 So.3d at 423)). As *Douglas* held and as *Walker* reaffirmed, the Phase I findings transcend brand-specific defects:

> [I]n Phase I, the class action jury was *not* asked to find brand-specific defects in the *Engle* defendants' cigarettes or to identify specific tortious actions. Instead, in instructing the jury, the *Engle* trial court explained that it was to determine "all common liability issues" for the class concerning "*the conduct of the tobacco industry*." . . . During Phase I, proof submitted on strict liability included brand-specific defects, but it also included proof that the *Engle* defendants' cigarettes were defective *because they are addictive and cause disease*.

21

*Douglas*, 110 So. 3d at 423 (emphasis added); *see also Walker*, 734 F.3d at 1287. ("Although the proof submitted to the jury included both general and brand-specific defects, the court concluded that the jury was asked only to determine all common liability issues for the class, not brand specific defects." (quotation marks omitted)).

It follows that the jury's conclusions regarding strict liability and negligence rest on what is essentially the least common denominator: the inherent defectiveness of cigarettes containing nicotine and the inherent lack of ordinary care exercised when a defendant placed such a defective product on the market to be sold. Any findings more specific could not have been "actually decided" by the Phase I jury, and their claim-preclusive application would raise the specter of violating due process.[8]

## II.

Unsurprisingly, this background featured prominently in Earl Graham's wrongful-death suit. His case went to trial on May 13, 2013. The trial spanned nine days. The District Court first instructed the jury that "[t]o be a member of the *Engle* class, Mr. Graham must prove by a preponderance of evidence that Mrs. Graham was addicted to cigarettes containing nicotine and that such addiction was

---

[8] We understand *Walker* to discuss only *Engle*-progeny strict-liability and negligence claims. We express no opinion regarding what effect—if any—*Walker* or *Walker*'s reasoning may have on other *Engle*-progeny claims, for example, fraudulent concealment or conspiracy to fraudulently conceal.

a legal cause of her death." If the jury found Faye Graham to be a member of the *Engle* class, the District Court then employed the framework articulated in *Douglas* to instruct the jury as follows:

> Mr. Graham's first claim is for negligence. One of the *Engle* findings was that the Defendants were negligent with respect to their manufacture and sale of cigarettes and you must accept that determination.
>
> Mr. Graham's second claim is for strict liability. One of the *Engle* findings was that the Defendants placed cigarettes on the market that were defective and unreasonably dangerous and you must accept that determination.
>
> The issue for your decision on both Mr. Graham's negligence and strict liability claims is, as to each Defendant, whether smoking cigarettes manufactured by that Defendant was a legal cause of Mrs. Graham's death.

R.J. Reynolds and Phillip Morris objected to these instructions on a number of grounds, including that they "invite the jury to improperly base its verdict on claims or theories that are in whole or in part preempted by federal law."[9]

The jury found for Graham on both his strict-liability and negligence claims, awarding him $2.75 million in compensatory damages. The jury also determined that Faye Graham was 70 percent responsible for her death, that R.J. Reynolds was 20 percent responsible for her death, and that Phillip Morris was 10 percent responsible for her death. The District Court then entered judgment against R.J.

---

[9] The defendants first asserted the preemption argument as the fourth affirmative defense in their answer to Graham's complaint. They also raised the issue in the joint pretrial statement and in their motion for judgment as a matter of law pursuant to Rule 50(a).

23

Reynolds for $550,000 and against Phillip Morris for $275,000 in light of the jury's allocation of fault.  The defendants renewed their motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b).[10]  Specifically, they argued that federal law preempted the jury's imposition of tort liability because it would frustrate the congressional objective "to foreclose the removal of tobacco products from the market despite the known health risks and addictive properties."  Relying on the doctrine of express preemption, the District Court denied the motion.  The defendants now appeal.

"We review the denial of a motion for judgment as a matter of law *de novo*." *Gowski v. Peake*, 682 F.3d 1299, 1310 (11th Cir. 2012) (per curiam).  "Under Rule 50, a court should render judgment as a matter of law when there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." *Id.*

### III.

Our constitutional system contemplates "that both the National and State governments have elements of sovereignty the other is bound to respect." *Arizona v. United States*, ___ U.S. ___, ___, 132 S. Ct. 2492, 2500, 183 L. Ed. 2d 351 (2012).  When state and federal law "conflict or [otherwise work] at cross-purposes," *id.*, the Supremacy Clause commands that federal law "shall be the

---

[10] The defendants moved, in the alternative, for a new trial under Rule 59.

supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding," U.S. Const. art. VI.  Simply put, state laws that "interfere with, or are contrary to," federal law cannot hold sway—they "must yield."  *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 211, 6 L. Ed. 23 (1824).

Federal law may preempt state law in three ways.  First, Congress has the authority to expressly preempt state law by statute.  *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372, 120 S. Ct. 2288, 2293, 147 L. Ed. 2d 352 (2000).  Second, even in the absence of an express preemption provision, "[t]he scheme of federal regulation may be so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it."  *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S. Ct. 1146, 1152, 91 L. Ed. 1447 (1947).  Third, federal and state law may impermissibly conflict, for example, "where it is impossible for a private party to comply with both state and federal law," *Crosby*, 530 U.S. at 373, 120 S. Ct. at 2294; or where the state law at issue "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S. Ct. 399, 404, 85 L. Ed. 581 (1941).[11]  It is this last subcategory of conflict preemption—obstacle preemption—we consider here.

---

[11] In surveying this taxonomy, however, we must keep in mind that "[c]ategories and labels are helpful, but only to a point, and they too often tend to obfuscate instead of illuminate." *Fla. State Conference of the NAACP v. Browning*, 522 F.3d 1153, 1167 (11th Cir. 2008); *see*

In the District Court, R.J. Reynolds and Phillip Morris advanced both express- and obstacle-preemption arguments in renewing their motion for a judgment as a matter of law.  The District Court's order denying that motion, however, discussed only express preemption.  But it is well-established that a lack of express preemption "does *not* bar the ordinary working of conflict pre-emption principles."  *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 869, 120 S. Ct. 1913, 1919, 146 L. Ed. 2d 914 (2000); *see also This That & The Other Gift & Tobacco, Inc. v. Cobb Cnty.*, 285 F.3d 1319, 1323 n.1 (11th Cir. 2002) ("The existence of an express preemption clause, however, neither bars the ordinary working of conflict preemption principles nor by itself precludes a finding of implied preemption."). To the extent the District Court's order suggests the contrary, the District Court erred.  On appeal, though, R.J. Reynolds and Phillip Morris appear to have abandoned their express-preemption theory and argue in favor of obstacle preemption alone.  Accordingly, that is the only type of preemption we address. *Cf. Hillman v. Maretta*, ___ U.S. ___, ___, 133 S. Ct. 1943, 1949, 186 L. Ed. 2d 43 (2013) (holding a state law invalid under obstacle preemption without discussing the scope of the federal statute's express-preemption clause).

---

*also English v. Gen. Elec. Co.*, 496 U.S. 72, 79 n.5, 110 S. Ct. 2270, 2275, 110 L. Ed. 2d 65 (1990) ("By referring to these three categories, we should not be taken to mean that they are rigidly distinct."); *cf.* Caleb Nelson, *Preemption*, 86 Va. L. Rev. 225, 264 (2000) ("[T]he labels that one uses to describe different types of rules do not capture anything very important about preemption doctrine.").

26

A.

Obstacle preemption leaves R.J. Reynolds and Phillip Morris with a tough row to hoe.  Supreme Court precedent teaches that "a high threshold must be met if a state law is to be preempted for conflicting with the purposes of a federal Act." *Chamber of Commerce v. Whiting*, ___ U.S. ___, ___, 131 S. Ct. 1968, 1985, 179 L. Ed. 2d 1031 (2011) (quotation marks omitted).  Indeed, "[i]mplied preemption analysis does not justify a freewheeling judicial inquiry into whether a state statute is in tension with federal objectives." *Id.* (quotation marks omitted).  That is because "such an endeavor would undercut the principle that it is Congress rather than the courts that preempts state law." *Id.* (quotation marks omitted).

In addition to overcoming this "high threshold," R.J. Reynolds and Phillip Morris must also confront the presumption against preemption—namely, that "we start with the assumption that the historic police powers of the States were not to be superseded by [federal law] unless that was the clear and manifest purpose of Congress." *Rice*, 331 U.S. at 230, 67 S. Ct. at 1152.[12]  The presumption is a "cornerstone[] of our pre-emption jurisprudence."[13]  *Wyeth v. Levine*, 555 U.S.

---

[12] It is unclear whether *Whiting* applies the presumption against preemption, albeit *sub silentio*, or whether it imposes an additional hurdle, above and beyond the presumption, to making a successful obstacle-preemption argument.

[13] The presumption against preemption has been hotly debated, particularly when applied to issues of statutory interpretation in cases involving express preemption. *Compare, e.g.*, *PLIVA, Inc. v. Mensing*, ___ U.S. ___, ___, 131 S. Ct. 2567, 2580, 180 L. Ed. 2d 580 (2011) (Thomas, J.) (plurality opinion) ("[C]ourts should not strain to find ways to reconcile federal law

27

555, 565, 129 S. Ct. 1187, 1194, 173 L. Ed. 2d 51 (2009).  And its logic carries particular force where, as here, "federal law is said to bar state action in fields of traditional state regulation."  *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655, 115 S. Ct. 1671, 1676, 131 L. Ed. 2d 695 (1995).  We must recognize, therefore, "the historic primacy of state regulation of matters of health and safety," which can be enforced through state statutes and state tort law alike.[14]  *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485, 116 S. Ct. 2240, 2250, 135 L. Ed. 2d 700 (1996).  Given the "great latitude" that states possess "under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons," *id.* at 475, 116 S. Ct. at 2245

---

with seemingly conflicting state law."), *with id.* at ___, 131 S. Ct. at 2591 (Sotomayor, J., dissenting) ("In the context of express pre-emption, we read federal statutes whenever possible not to pre-empt state law.").  In the absence of an express preemption provision, however, the presumption appears to rest on less contested ground, at least for the time being.  *Wyeth v. Levine*, 555 U.S. 555, 589 n.2, 129 S. Ct. 1187, 1208, 173 L. Ed. 2d 51 (2009) (Thomas, J., concurring) ("Because it is evident from the text of the relevant federal statutes and regulations themselves that the state-law judgment below is not pre-empted, it is not necessary to decide whether, or to what extent, the presumption should apply in a case such as this one, where Congress has not enacted an express-pre-emption clause.").  That said, the presumption has a tendency to make sporadic appearances in the Court's preemption jurisprudence; among the five preemption cases decided during the 2011 Term, for example, not one discussed the presumption.  Ernest A. Young, *"The Ordinary Diet of the Law": The Presumption Against Preemption in the Roberts Court*, 2011 Sup. Ct. Rev. 253, 331.

[14] "[C]ommon-law damages actions . . . are premised on the existence of a legal duty . . . . [I]t is the essence of the common law to enforce duties that are either affirmative *requirements* or negative *prohibitions*. . . . At least since *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938), we have recognized the phrase 'state law' to include common law as well as statutes and regulations."  *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 522, 112 S. Ct. 2608, 2620, 120 L. Ed. 2d 407 (1992) (plurality opinion) (interpreting an express preemption provision contained in the Public Health Cigarette Smoking Act of 1969, Pub. L. No. 91-222, § 5(b), 84 Stat. 87 (codified at 15 U.S.C. § 1334(b))).

(quotation marks omitted), we will not ascribe to Congress the intent "cavalierly [to] pre-empt state-law causes of action," *id.* at 485, 116 S. Ct. at 2250.  To do otherwise would ignore altogether that "[t]he allocation of powers in our federal system preserves the integrity, dignity, and residual sovereignty of the States." *Bond v. United States*, ___ U.S. ___, ___, 131 S. Ct. 2355, 2364, 180 L. Ed. 2d 269 (2011).

The lodestar of any preemption inquiry is congressional intent.  *Retail Clerks Int'l Ass'n v. Schermerhorn*, 375 U.S. 96, 103, 84 S. Ct. 219, 223, 11 L. Ed. 2d 179 (1963).  In assessing the extent to which state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines*, 312 U.S. at 67, 61 S. Ct. at 404, "[w]hat [constitutes] a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects," *Crosby*, 530 U.S. at 373, 120 S. Ct. at 2294.  To begin, then, "we must first ascertain the nature of the federal interest." *Hillman*, ___ U.S. at ___, 133 S. Ct. at 1950.

## B.

By our count, Congress has enacted at least seven statutes regulating tobacco products in the past fifty years.  We examine their text and structure, which provide the most reliable indicia of what Congress has resolved itself to achieve.

29

*CTS Corp. v. Waldburger*, ___ U.S. ___, ___ 134 S. Ct. 2175, 2185, 189 L. Ed. 2d 62 (2014).  This amounts to the "classic judicial task of reconciling many laws enacted over time, and getting them to 'make sense' in combination."  *United States v. Fausto*, 484 U.S. 439, 453, 108 S. Ct. 668, 676–77, 98 L. Ed. 2d 830 (1988).

We start with first principles.  Congress possesses the constitutional authority to ban cigarettes.  *See* U.S. Const., art. I, § 8, cl. 3.  It has never done so.  This, despite an ever-growing body of research documenting the health risks associated with smoking.  In 1964, for example, the Surgeon General issued a report concluding that "[c]igarette smoking is a health hazard of sufficient importance in the United States to warrant appropriate remedial action."  Advisory Comm. to the Surgeon Gen. of the Public Health Serv., U.S. Dep't of Health, Educ., & Welfare, *Smoking and Health* 33 (1964), *available at* http://profiles.nlm.nih.gov/ps/access/NNBBMQ.pdf.  The report warned "that cigarette smoking contributes substantially to mortality from certain specific diseases and to the overall death rate."  *Id.* at 31.

These findings spurred legislative action.  Congress's first attempt to address cigarette smoking and its consequences came in the Federal Cigarette Labeling and Advertising Act (the "Labeling Act"), Pub. L. No. 89-92, 79 Stat. 282 (1965) (codified as amended at 15 U.S.C. §§ 1331–1341).  The Labeling Act aimed to

"establish a comprehensive Federal program to deal with cigarette labeling and advertising."  *Id.* § 2.  Central to this comprehensive program was a requirement that all cigarette packages display the warning statement, "Caution: Cigarette Smoking May Be Hazardous to Your Health."  *Id.* § 4.

For our purposes, the Labeling Act is instructive because it encapsulates the competing interests Congress has sought to reconcile when regulating cigarettes. On the one hand, Congress has recognized that smoking can cause serious physical harm, even death.  On the other hand, Congress has also acknowledged the important role tobacco production and manufacturing plays in the national economy.  Congress has carefully calibrated these policy considerations by promoting full disclosure to consumers about the attendant risks tobacco products carry, thereby permitting free but informed choice.  The plain language of the Labeling Act summarizes well this approach:

It is the policy of the Congress . . . [that]

(1) the public may be adequately informed that cigarette smoking may be hazardous to health by inclusion of a warning to that effect on each package of cigarettes; and
(2) commerce and the national economy may be (A) protected to the maximum extent consistent with this declared policy and (B) not impeded by diverse, nonuniform, and confusing cigarette labeling and advertising regulations . . . .

31

*Id.* § 2.[15]

Since the Labeling Act's passage, Congress's basic goals have remained largely unchanged.  For example, Congress has tinkered with the text of the warning labels affixed to cigarette packages in an effort to arm consumers with more complete and accurate information.  Public Health Cigarette Smoking Act of 1969, Pub. L. No. 91-222, § 4, 84 Stat. 87 (codified as amended at 15 U.S.C. § 1333); Comprehensive Smoking Education Act, Pub. L. No. 98-474, § 4, 98 Stat. 2200 (1984) (codified at 15 U.S.C. § 1333).  To promote transparency, Congress has required the Secretary of Health and Human Services to issue a report to Congress every three years regarding the "addictive property of tobacco."  Alcohol and Drug Abuse Amendments of 1983, Pub. L. No. 98-24, 97 Stat. 175.  Congress has stepped in to regulate smokeless tobacco products, too.  Comprehensive Smokeless Tobacco Health Education Act of 1986, Pub. L. No. 99-252, 100 Stat.

---

[15] Senator Neuberger (D-OR), who introduced a version of the Labeling Act in the Senate, put it this way:

> I do not carry around with me a pair of scissors to cut off burning cigarettes in the mouths of those I meet.  I have never attacked a cigarette stand with a hatchet.  I have never equated smoking with sin.  Abstention from tobacco is not a condition of employment with my staff.  I have never introduced legislation nor have I ever delivered a speech calling for the abolition of cigarettes. . . .
>
> What have I advocated, then?  Briefly, I believe there are four general sectors of Government activity in which remedial action is justified: first, education of both the presmoking adolescent and the adult smoker; second, expanded research into the technology of safer smoking; third, reform of cigarette advertising and promotion; and fourth, cautionary and informative labeling of cigarette packages.

111 Cong. Rec. S13899 (daily ed. June 16, 1965) (statement of S. Neuberger).

30. And Congress has even incentivized states to prohibit the sale of tobacco products to minors by conditioning block grants on the creation of programs "to discourage the use of . . . tobacco products by individuals to whom it is unlawful to sell or distribute such . . . products." Alcohol, Drug Abuse, and Mental Health Administration Reorganization Act, Pub. L. No. 102-321, § 202, 106 Stat. 323 (1992) (codified at 42 U.S.C. § 300x-22).

All this, but no ban on the sale of cigarettes to adult consumers. No ban even though over the last fifty years a scientific consensus has emerged that smoking can kill. The Surgeon General has reaffirmed this, at least twice. Office of the Surgeon Gen., U.S. Dep't of Health & Human Servs., *The Health Consequences of Smoking: Nicotine Addiction* (1988), *available at* http://profiles.nlm.nih.gov/ps/access/NNBBZD.pdf; Office of the Surgeon Gen., U.S. Dep't of Health & Human Servs., *The Health Consequences of Smoking—50 Years of Progress* (2014), *available at* http://www.surgeongeneral.gov/library/reports/50-years-of-progress/full-report.pdf. The Environmental Protection Agency has classified secondhand smoke as a known human carcinogen. Office of Health & Envtl. Assessment, *Respiratory Health Effects of Passive Smoking: Lung Cancer and Other Disorders* 4 (1992), *available at* http://cfpub.epa.gov/ncea/cfm/recordisplay.cfm?deid=2835. The Food and Drug Administration (the "FDA") has published research indicating

33

that "[t]he pharmacological processes that cause [nicotine addiction] are similar to those that cause addiction to heroin and cocaine." FDA, Jurisdictional Determination, 61 Fed. Reg. 44619, 44631 (Aug. 28, 1996). These are, of course, but a few examples.

In short, Congress has known about the dangers of cigarettes for many years. Congress has regulated cigarettes for many years. But it has never banned them. Indeed, regulation of cigarettes rests on the assumption that they will still be sold and that consumers will maintain a "right to choose to smoke or not to smoke." H.R. Rep. No. 89-449 (1965), *reprinted in* 1965 U.S.C.C.A.N. 2350, 2352.

The Supreme Court has so concluded, holding that the FDA lacked jurisdiction to regulate cigarettes because it would have otherwise been required by statute to prohibit their sale. *FDA v. Brown & Williamson Tobacco Co.*, 529 U.S. 120, 161, 120 S. Ct. 1291, 1315–16, 146 L. Ed. 2d 121 (2000). This result, the Court determined, would have contravened the intent of Congress, given that "the collective premise of these statutes is that cigarettes and smokeless tobacco will continue to be sold in the United States." *Id.* at 139, 120 S. Ct. at 1304.

And although Congress has overruled this decision, granting the FDA regulatory authority over cigarettes in 2009, Congress nonetheless stated that the FDA "is prohibited from" "banning all cigarettes" or "requiring the reduction of nicotine yields of a tobacco product to zero." Family Smoking Prevention and

34

Tobacco Control Act (the "TCA"), Pub. L. No. 111-31, § 907(d)(3)(A)–(B), 123 Stat. 1776 (2009) (codified at 21 U.S.C. § 387g).  To be sure, the TCA does not "affect any action pending in Federal . . . court" prior to its enactment—including this one.  *Id.* § 4(a)(2); *see Engle III*, 945 So. 2d at 1277 (noting that *Engle* progeny cases must be filed within one year of the issuance of the case's mandate).  It merely makes textually explicit what was already evident by negative implication:  Congress has never intended to prohibit consumers from purchasing cigarettes.  To the contrary, it has designed "a distinct regulatory scheme" to govern the product's advertising, labelling, and—most importantly—sale.  *Brown & Williamson*, 529 U.S. at 155, 120 S. Ct. at 1312.

## C.

We now turn to how these federal objectives interact with state law.  Federal law can expressly or impliedly preempt a state tort suit.  *E.g.*, *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 120 S. Ct. 1913, 146 L. Ed. 2d 914 (2000) (finding implied preemption of state tort suit); *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 112 S. Ct. 2608, 120 L. Ed. 2d 407 (1992) (plurality opinion) (finding express preemption of certain state tort suits); *see generally Williamson v. Mazda Motor of Am., Inc.*, ___ U.S. ___, ___, 131 S. Ct. 1131, 1136, 179 L. Ed. 2d 75 (2011) (collecting cases).  A tort is "a breach of a duty that the law imposes on persons who stand in a particular relation to one another."  Black's Law Dictionary 1626

(9th ed. 2009).  As such, successful tort actions "are premised on the existence of a legal duty." *Cipollone*, 505 U.S. at 522, 112 S. Ct. at 2620 (plurality opinion); *see also Geier*, 529 U.S. at 881, 120 S. Ct. at 1925 (characterizing a successful tort action as "a state law—*i.e.*, a rule of state tort law imposing . . . a duty").  Strict-liability and negligence claims like those at issue here are no exception.  *Mutual Pharm. Co. v. Bartlett*, ___ U.S. ___, ___, 133 S. Ct. 2466, 2474 n.1, 186 L. Ed. 2d 607 (2013) ("[M]ost common-law causes of action for negligence and strict liability . . . exist . . . to . . . impose affirmative duties."); *Samuel Friedland Family Enters. v. Amoroso*, 630 So. 2d 1067, 1068 n.3 (Fla. 1994) (recognizing, in the strict-liability context, that "[o]ne who sells any product in a defective condition unreasonably dangerous to the user or consumer . . . is subject to liability for physical harm thereby caused" even though "the seller has exercised all possible care in the preparation and sale of his product" (quoting Restatement (Second) of Torts § 402A)); *Curd v. Mosaic Fertilizer LLC*, 39 So. 3d 1216, 1227 (Fla. 2010) (noting that a negligence claim requires identification of "[a] duty, or obligation, recognized by the law, requiring the [defendant] to conform to a certain standard of conduct, for the protection of others against unreasonable risks" (citation omitted) (second alteration in original)).

These duties, moreover, can stand as just as much of an obstacle to the purposes and objectives of Congress as a state statute or administrative regulation.

*E.g.*, *Williamson*, ___ U.S. at ___, 131 S. Ct. at 1136; *Geier*, 529 U.S. at 886, 120 S. Ct. at 1928.  That is because, like any statute, common-law duties amount to "either affirmative *requirements* or negative *prohibitions*."  *Cipollone*, 505 U.S. at 522, 112 S. Ct. at 2620 (plurality opinion).  Our job, then, is to determine whether the legal duties underpinning Graham's strict-liability and negligence claims impermissibly stand as an obstacle to the achievement of federal objectives—here, regulating, but not banning, the sale of cigarettes.  To accomplish this task, we must return to *Engle*.

Three aspects of that litigation inform how we characterize the duty it has come to impose on cigarette manufacturers.  First, the *Engle* class definition does not distinguish among types of smokers, types of cigarette manufacturers, or types of cigarettes.  It applies across the board.  The class definition thus creates a "brandless" cigarette, one produced by all defendants and smoked by all plaintiffs at all times throughout the class period.

Second, the Phase I findings, given claim-preclusive effect by *Douglas* reading *Engle III*, concern conduct common to the class.  This approach reinforces the brandless nature of the *Engle* litigation because it is impossible to determine which pieces of brand-specific evidence the Phase I jury found relevant in reaching the conclusion that all defendants had breached duties owed to the class.  To avoid a due process violation, the Phase I findings must turn on the only common

37

conduct presented at trial—that the defendants produced, and the plaintiffs smoked, cigarettes containing nicotine that are addictive and cause disease.

Third, the *Douglas* causation instruction removes the need to litigate brand-specific defects in *Engle*-progeny trials altogether. Progeny plaintiffs must only prove how their addiction to cigarettes containing nicotine caused their injuries, not how the specific conduct of a specific defendant caused their injuries.

Taken together, these three factors compel the conclusion that *Engle* strict-liability and negligence claims have imposed a duty on all cigarette manufacturers that they breached every time they placed a cigarette on the market. That result is inconsistent with the full purposes and objectives of Congress, which has sought for over fifty years to safeguard consumers' right to choose whether to smoke or not to smoke.

1.

First, *Engle* is a class-action lawsuit filed against the major American tobacco manufacturers on behalf of all Florida smokers. Class members were not sorted by the brands they smoked, the nature of their smoking habits, or the injuries they alleged. The class included any Floridian who suffered injuries caused by his or her addiction to cigarettes that contained nicotine. The result: the *Engle* Phase I trial plan "enabled the plaintiffs to try fifty years of alleged misconduct that they never would have been able to introduce in an individual

38

trial, which was untethered to any individual plaintiff" and thereby "created a composite plaintiff who smoked every single brand of cigarettes, saw every single advertisement, read every single piece of paper that the tobacco industries ever created or distributed, and knew about every single allegedly fraudulent act." *Engle II*, 853 So. 2d at 467 n.48.

This class was certified despite Florida Rule of Civil Procedure 1.220(b)(3)'s instruction that

> [a] claim or defense may be maintained on behalf of a class if the court concludes that . . . questions of law or fact common to . . . the claim or defense of each member of the class predominate over any question of law or fact affecting only individual members of the class, and class representation is superior to other available methods for the fair and efficient adjudication of the controversy.

"Florida Rule of Civil Procedure 1.220, which establishes the guidelines for class actions, was modeled after Federal Rule of Civil Procedure 23." *Johnson v. Plantation Gen. Hosp. Ltd. P'ship*, 641 So. 2d 58, 59 (Fla. 1994).

It is therefore noteworthy that at least two federal circuit courts have refused to certify similar classes, which attempted to aggregate the claims of injured smokers against the major tobacco companies. *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 143 (3d Cir. 1998) (upholding the denial of certification for a Rule 23(b)(2) medical-monitoring class, in part on the ground that "plaintiffs were 'exposed to different . . . products, for different amounts of time, in different ways, and over different periods'" (alteration in original) (quoting *Amchem Prods., Inc. v.*

39

*Windsor*, 521 U.S. 591, 624, 117 S. Ct. 2231, 2250, 138 L. Ed. 2d 689 (1997)));

*Castano v. Am. Tobacco Co.*, 84 F.3d 734, 752 (5th Cir. 1996) (reversing as an

abuse of discretion the District Court's decision to certify a Rule 23(b)(3) class and

observing that "[t]he collective wisdom of individual juries is necessary before this

court commits the fate of an entire industry or, indeed, the fate of a class of

millions, to a single jury").

And at least one Justice on the Florida Supreme Court has taken a similar

view. *Engle III*, 945 So. 2d at 1282 (Wells, J., concurring in part and dissenting in

part) ("The bottom line is that this was not properly a class action.").

2.

Second, the Phase I jury findings do not apply to specific brands.  According

to the Florida Supreme Court, those findings—which have claim-preclusive effect

on trials conducted after the class decertification—involve the "conduct of the

tobacco industry" as a whole.  *Phillip Morris USA, Inc. v. Douglas*, 110 So. 3d

419, 423 (Fla. 2013); *see also Walker v. R.J. Reynolds Tobacco Co.*, 734 F.3d

1278, 1285 (11th Cir. 2013) ("[T]he jury was asked only to determine all common

liability issues for the class, not brand specific defects." (quotation marks

omitted)).  To be sure, the Phase I jury considered brand-specific evidence during

the trial.  *See supra* note 4 (quoting *Engle v. R.J. Reynolds Tobacco Co.* ("*Engle

F.J.*"), 2000 WL 33534572 (Fla. Cir. Ct. Nov. 6, 2000)).  But the specific findings

cited in *Engle F.J.* are symptomatic of the central problem presented by this appeal: although the Phase I jury reviewed a litany of evidence regarding various brand-specific defects, the Phase I interrogatories shed no light on which defects the jury found relevant in determining how each defendant breached a duty to refrain from selling a defective product or from failing to exercise ordinary care.

We are left to rely on the interpretations of the Delphic Phase I findings offered in *Douglas* and *Walker*. Both cases have recognized that at this point, sitting over a decade's remove from the Phase I verdict, it is impossible to discern the extent to which the Phase I findings specifically match up with each of the *Engle* defendants. *See Douglas*, 110 So. 3d at 433; *Walker*, 734 F.3d at 1287. The Florida Supreme Court interpreted Florida law in a way that eliminates this problem, both by using claim preclusion to afford the Phase I findings res judicata effect and by interpreting the Phase I findings to address only "common liability issues." *Douglas*, 110 So. 3d at 423. Our court has sanctioned the constitutionality of that approach, but only to the extent the Phase I findings go to conduct common to the class. *Walker*, 734 F.3d at 1289.

Scoured of any evidence regarding brand-specific defects, the Phase I findings regarding strict-liability and negligence amount to the bare assertion that cigarettes are inherently defective—and cigarette manufacturers inherently negligent—because cigarettes are addictive and cause disease. And because "[o]ne

41

who sells any product in a defective condition unreasonably dangerous to the user or consumer . . . is subject to liability for physical harm thereby caused," *Amoroso*, 630 So. 2d at 1068 n.3 (quoting Restatement (Second) of Torts § 402A), and because one must "conform to a certain standard of conduct, for the protection of others against unreasonable risks," *Curd*, 39 So. 3d at 1227, the *Engle* defendants breached a state-law duty every time they placed a cigarette on the market to be sold.

### 3.

Third, the *Douglas* causation instruction does not necessarily require brand-specific defects to *ever* be litigated in *Engle*-progeny trials. All plaintiffs need prove is class membership, damages, and what the Florida Supreme Court has deemed "individual causation," that is, proof that addiction to smoking an *Engle* defendant's cigarettes was a legal cause of the injuries alleged. *Douglas*, 110 So. 3d at 430. Plaintiffs do not need to casually link specific conduct by a defendant—how a defendant was negligent, for example—to succeed. *But see Waggoner v. R.J. Reynolds Tobacco Co.*, 835 F. Supp. 2d 1244, 1278 (M.D. Fla. 2011) ("[P]laintiffs' burden of proving causation is one of the primary procedural safeguards erected by the Florida Supreme Court in *Engle III*."). According to the Florida Supreme Court, this issue was already decided in Phase I because cigarettes containing nicotine are addictive and cause disease. *E.g.*, *Douglas*, 110

So.3d at 429 ("[T]he Second District properly applied *Engle* when holding that legal causation for the strict liability claim was established by proving that addiction to the *Engle* defendants' cigarettes containing nicotine was a legal cause of the injuries alleged.").

In sum, brand-specific defects were not determined during Phase I; they do not need to be determined during *Engle*-progeny trials, either. And the class definition is of no help, because it does not distinguish among plaintiffs who smoked different brands at different times—all addicted smokers are the same; so, too, are all cigarettes. Thus, as a result of the interplay between the Florida Supreme Court's interpretations of the *Engle* findings and the strictures of due process, the necessary basis for Graham's *Engle*-progeny strict-liability and negligence claims is that all cigarettes sold during the class period were defective as a matter of law. This, in turn, imposed a common-law duty on cigarette manufacturers that they necessarily breached every time they placed a cigarette on the market. Such a duty operates, in essence, as a ban on cigarettes. Accordingly, it conflicts with Congress's clear purpose and objective of regulating—not banning—cigarettes, thereby leaving to adult consumers the choice whether to smoke cigarettes or to abstain. We therefore hold that Graham's claims are preempted by federal law.

D.

It is no answer to characterize Graham's tort suit as a cost of doing business instead of a ban. Although R.J. Reynolds and Phillip Morris can pay damages and continue selling cigarettes, "pre-emption cases do not ordinarily turn on such compliance-related considerations as whether a private party in practice would ignore state legal obligations—paying, say, a fine instead—or how likely it is that state law actually would be enforced." *Geier*, 529 U.S. at 882, 120 S. Ct. at 1926; *cf. Cipollone*, 505 U.S. at 521, 112 S. Ct. at 2620 (plurality opinion) (noting that state regulation "can be as effectively exerted through an award of damages as through some form of preventive relief. The obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy." (quotation marks omitted)).

Admittedly, how compliance-related considerations should factor into preemption analysis—if at all—remains something of open question. "The Court has on occasion suggested that tort law may be somewhat different, and that related considerations—for example, the ability to pay damages instead of modifying one's behavior—may be relevant for pre-emption purposes." *Geier*, 529 U.S. at 882, 120 S. Ct. at 1926.[16] We do not write on a blank slate, however.

---

[16] For this proposition, *Geier* relies on a trio of cases relating to field preemption and the Atomic Energy Act, which are far removed, both factually and legally, from this appeal. *English v. Gen. Elec. Co.*, 496 U.S. 72, 110 S. Ct. 2270, 110 L. Ed. 2d 65 (1990); *Goodyear Atomic*

44

Justice Blackmun's opinion for himself and two other Justices in *Cipollone* forcefully contended that tort law should be treated differently from positive enactments for preemption purposes. 505 U.S. at 536–37, 112 S. Ct. at 2627–28 (Blackmun, J., concurring in part and dissenting in part) ("The effect of tort law on a manufacturer's behavior is necessarily indirect. . . . The level of choice that a defendant retains in shaping its own behavior distinguishes the indirect regulatory effect of the common law from positive enactments such as statutes and administrative regulations."). But he lost that argument: his opinion did not command a majority. And critically, his logic was called into question by a majority of the Court in *Geier*. 529 U.S. at 882, 120 S. Ct. at 1926 ("[T]his Court's pre-emption cases ordinarily *assume* compliance with the state-law duty in question."). Absent more specific guidance from the Supreme Court, we must follow *Geier*'s lead in assuming that R.J. Reynolds and Phillip Morris will comply with whatever state-law duties Florida may impose.

Nor is it convincing to argue that Congress, well aware of state tort litigation against the tobacco companies, would not have intended to preempt state-law claims similar to the two at issue here. *See Wyeth v. Levine*, 555 U.S. 555, 574–75,

---

*Corp. v. Miller*, 486 U.S. 174, 108 S. Ct. 1704, 100 L. Ed. 2d 158 (1988); *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 104 S. Ct. 615, 78 L. Ed. 2d 443 (1984). As such, these three cases are far too thin a reed on which to base our reasoning. And in any event, *Geier* itself clearly places a thumb on the scale in favor of assuming compliance with the duties imposed through a successful state tort suit. 529 U.S. at 882, 120 S. Ct. at 1926.

129 S. Ct. 1187, 1200, 173 L. Ed. 2d 51 (2009) ("If Congress thought state-law suits posed an obstacle to its objectives, it surely would have enacted an express pre-emption provision . . . . Its silence on the issue, coupled with its certain awareness of the prevalence of state tort litigation, is powerful evidence that Congress did not intend [to preempt state tort suits.]"); *cf. Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 166–67, 109 S. Ct. 971, 986, 103 L. Ed. 2d 118 (1989). That proposition may be true at a high level of generality. But as we have explained in great detail, Graham's is not a run-of-the-mill tort suit. If it were, our analysis would be radically different. Make no mistake: we should not be taken to mean that we believe Congress intended to insulate tobacco companies from all state tort liability. To the contrary, there is nothing in the text, structure, or legislative history of the federal statutes we have examined to support such a far-reaching proposition. *See Richardson v. R.J. Reynolds Co.*, 578 F. Supp. 2d 1073 (E.D. Wis. 2008).

We merely conclude that, having surveyed both federal and state law, it is clear that Congress would have intended to preempt Graham's strict-liability and negligence claims, rooted as they are in the *Engle* jury findings, which have been interpreted by the Florida courts to possess unprecedented breadth. We express no opinion as to other state-law suits that may rest on significantly narrower theories of liability than the *Engle* litigation.

46

E.

Graham's remaining arguments against preemption are unpersuasive.

First, Graham argues that his claims are not expressly preempted. Fair enough. But that is of little import. A lack of express preemption "does *not* bar the ordinary working of conflict pre-emption principles." *Geier*, 529 U.S. at 869, 120 S. Ct. at 1919.

Second, Graham contends that his suit is otherwise shielded by the saving clause in the Comprehensive Smokeless Tobacco Health Education Act of 1986, Pub. L. No. 99-252, § 7, 100 Stat. 30 (codified at 15 U.S.C. § 4406). This argument suffers from a similar misunderstanding of basic preemption doctrine: a "saving clause (like the express pre-emption provision) does *not* bar the ordinary working of conflict pre-emption principles." *Geier*, 529 U.S. at 869, 120 S. Ct. at 1919.

Third, Graham believes that our court's decision in *Spain v. Brown & Williamson Tobacco Corp.*, 363 F.3d 1183 (11th Cir. 2004), controls the outcome of this case. Hardly. *Spain* concerns express preemption of Alabama state tort claims. It has nothing to do with either obstacle preemption or Florida law, much less *Engle*-progeny claims.

47

Fourth, Graham says that the presumption against preemption should tilt the balance of this case in his favor.  The presumption provides him no refuge.  We are, of course, mindful that "the historic police powers of the States [are] not to be superseded by [federal law] unless that was the clear and manifest purpose of Congress."  *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S. Ct. 1146, 1152, 91 L. Ed. 1447 (1947); *see also supra* part III.A.  But the presumption is just that—a presumption, to be applied as "tiebreaker" of sorts when the case is close.  Here, we have no difficulty concluding that the clear and manifest purpose of Congress has been to keep cigarettes legally available for adult consumers despite known health risks.  The Florida courts have come to interpret the *Engle* Phase I jury findings to demand an outcome Congress has sought to avoid, namely, the imposition of a duty that was breached every time a cigarette manufacturer placed a cigarette on the market to be sold—the functional equivalent of a flat ban.

Fifth, Graham insists that by preempting his strict-liability and negligence claims, we will leave *Engle*-progeny plaintiffs a right without a remedy.  Not true.  To begin, we express no opinion as to the validity of other *Engle* claims, for example, fraudulent concealment or conspiracy to conceal.  And as we have explained, nothing in our reasoning prevents an injured plaintiff from bringing a state-law tort suit against a tobacco company, provided he does not premise his suit on a theory of liability that means all cigarettes are defective as a matter of law

48

(and provided that he can actually prove his case). Nor does our conclusion necessarily foreclose *Engle*-progeny plaintiffs from bringing state-law strict-liability or negligence claims, so long as they do not rely on the *Engle* jury findings to do so. The subtext of Graham's legal analysis seems to suggest that his claims are immune from preemption simply because the *Engle* litigation has managed to survive for twenty years and has now grown too-big-to-fail. Thankfully, our Constitution lends credence to no such argument.

## IV.

Cigarette smoking presents one of the most intractable public health problems our nation has ever faced. It was not so long ago that anyone would walk a mile for a Camel: cigarette smoke once filled movie theaters, college classrooms, and even indoor basketball courts. For fifty years, the States and the federal government have worked to raise awareness about the dangers of smoking and to limit smoking's adverse consequences to the greatest extent possible, all without prohibiting the sale of cigarettes to adult consumers. To that end, the State of Florida may ordinarily enforce duties on cigarette manufacturers in a bid to protect the health, safety, and welfare of its citizens. But it may not enforce a duty, as it has through the *Engle* jury findings, premised on the theory that *all* cigarettes are inherently defective and that *every* cigarette sale is an inherently negligent act. So our holding is narrow indeed: it is only these specific, sweeping bases for state tort

49

liability that we conclude frustrate the full purposes and objectives of Congress. As a result, Graham's *Engle*-progeny strict-liability and negligence claims are preempted, and we must reverse the District Court's denial of judgment as a matter of law.

For these reasons, the judgment of the District Court is

REVERSED.